The PEOPLE OF the STATE OF NEW YORK, by their attorney, Robert ABRAMS, Attorney General of the State of New York, Petitioners,

v.

TRANS WORLD AIRLINES, INC., Respondent.

The PEOPLE OF the STATE OF NEW YORK, by their attorney, Robert ABRAMS, Attorney General of the State of New York, Petitioners,

v.

PAN AMERICAN WORLD AIRWAYS, INC., Respondent.

PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,

v.

Robert ABRAMS, as Attorney General of the State of New York, Defendant.

Nos. 89 Civ. 2298 (RWS), 89 Civ. 2867 (RWS) and 89 Civ. 2425 (RWS).

United States District Court, S.D. New York.

Nov. 13, 1989.

As Amended Nov. 13, 1989 and Jan. 12, 1990.

**164**

ecutive Law § 63, subd. 12; N.Y.McKinney's General Business Law § 350.

---

Fulbright Jaworski & Reavis McGrath, New York City, for Pan American World Airways, Inc. and Trans World Airlines, Inc.; Marc S. Dreier, Andrew C. Freedman, Margaret M. Harding, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for the people; John W. Corwin, Asst. Atty. Gen., Bureau of Consumer Frauds and Protection, Ronna D. Brown, Andrea C. Levine, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff State of New York ("New York" or the "State") has moved pursuant to 28 U.S.C. § 1447(c) for an order remanding to state court the removed actions against defendant Trans World Airlines, Inc. ("TWA") (89 Civ. 2298) (the "TWA State Action") and defendant Pan American World Airways, Inc. ("Pan Am") (89 Civ. 2867) (the "Pan Am State Action") and dismissing pursuant to Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P., the lawsuit Pan Am commenced against Robert Abrams, New York's Attorney General ("Abrams"), in this court (89 Civ. 2425) (the "Pan Am Federal Action"). TWA and Pan Am (together, the "Airlines") have moved for an order staying these actions pending disposition of related litigation in the Western District of Texas or transferring these actions to the Western District of Texas pursuant to 28 U.S.C. § 1404(a).[1] For the reasons set forth below, New York's motion to remand the TWA and Pan Am State Actions is granted, its motion to dismiss the Pan Am Federal Action is granted in part and denied in part, and the Airlines' motion to stay or transfer these actions is denied.

---

**1.** The Airlines also have moved in the alternative for an order staying these actions pending disposition by the Judicial Panel on Multidistrict Litigation (the "JPML") of the motion to transfer these actions to the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1407. This motion is moot because the JPML denied the motion to transfer on October 5, 1989.

## PRIOR PROCEEDINGS

On November 14, 1988, the Texas Attorney General's office wrote TWA on behalf of California, Massachusetts, New York, Texas, and Washington "to reaffirm the position of the states" that "any fuel, tax, or other surcharge to a fare must be included in the total advertised price of the fare." The letter stated that "[f]ailure to do so violates our respective state consumer protection laws" and cautioned the airline that "[t]his is the final opportunity to cure your violation of the state laws." It continued: "This letter serves as formal notice of intent to sue as required by our respective state laws. If your airline deceptively advertises fares in the future, you will be subject to being sued without further notice or opportunity to cure." Continental Airlines, Inc. ("Continental") and British Airways PLC ("British Airways") received similar letters.

In response, TWA, Continental, and British Airways sued the Texas Attorney General in the United States District Court for the Western District of Texas on January 23, 1989 for a preliminary injunction barring him from challenging the airlines' advertising practices (the "Texas Federal Action"). Thirty-three other states—including New York—joined Texas in opposing the preliminary injunction motion by filing a "Motion of Specially Appearing States." That document provided that the states were "specially" appearing, "without admitting or submitting to the subject matter jurisdiction of this Court and without admitting that this Court has personal jurisdiction over them...."

The Texas Federal Action was assigned to the Honorable Walter S. Smith, Jr. On January 30, 1989, Judge Smith enjoined Texas from suing TWA, Continental, and British Airways. Responding to a request for clarification from the Kansas Attorney General, Judge Smith on February 23, 1989 stated that the preliminary injunction applied to Texas only (the "February Order").

Following the February Order, several states commenced state court lawsuits outside the preliminary injunction's scope. On February 28, 1989, Texas sued Pan Am, alleging deceptive advertising under sections 17.46(a) and (b) of that state's Deceptive Trade Practices–Consumer Protection Act. California sued TWA on March 9, 1989 under sections 17200, 17500, and 17504 of the California Business and Professions Code.

On March 16, 1989, the airlines moved to broaden the preliminary injunction to include the states that had "specially" appeared in opposition. While that motion was pending, New York commenced the TWA State Action on March 29, 1989, alleging false advertising in violation of section 350 of the General Business Law and persistent fraudulent conduct in violation of section 63(12) of the Executive Law.

Less than two weeks after New York had sued TWA in state court, Pan Am initiated the Pan Am Federal Action. Pan Am sought a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring unconstitutional New York's enforcement of the Guidelines through state law and an injunction pursuant to 28 U.S.C. § 2202 enjoining that enforcement. Pan Am's complaint alleged claims for preemption by the FAA under the Supremacy Clause and for violations of the Commerce Clause, the Interstate Compact Clause, and the First Amendment.

Little more than a week later, New York commenced the Pan Am State Action on April 20, 1989, alleging false advertising in violation of section 350 of the General Business Law, persistent fraudulent conduct in violation of section 63(12) of the Executive Law, and breach of contract.[2] On April 23,

---

**2.** New York grounded the breach of contract claims in Pan Am's alleged noncompliance with "Assurances of Discontinuance" the airline had executed on September 28, 1987 and January 4, 1988. In the former, Pan Am agreed "that all future advertisements in the State of New York for airfares or discounts on airfares will clearly and conspicuously disclose the existence of any material restrictions regarding airfare or discounts on airfare, including but not limited to, advance purchase requirements, weekend surcharges, cancellation penalties, change of date/itinerary penalties, holiday restrictions, and travel on specific days of the week requirements as set forth by Pan Am." In the latter, Pan Am agreed that "[i]n all future advertise-

1989, the Kansas Attorney General sued TWA for violating sections 50–626(a), (b)(2), and (5) and 50–627(a) and (b) of the Kansas Consumer Protection Act.

On April 26, 1989, Judge Smith reversed the February Order and extended the preliminary injunction to the thirty-three other states prospectively. He also granted the airlines' motion to add the thirty-three states as parties. The airlines joined the attorneys general of these states as defendants by filing a Notice of Joinder and Amended Complaint on May 8, 1989. On May 26, 1989, Judge Smith granted Pan Am leave to intervene and broadened the preliminary injunction to include Pan Am. New York moved on June 23, 1989 to dismiss the action against it, alleging that the Texas court lacked personal and subject matter jurisdiction and that venue was improper.

Judge Smith's rulings currently are on appeal before the United States Court of Appeals for the Fifth Circuit.

The airline defendants in the state court actions removed those cases to this court pursuant to 28 U.S.C. §§ 1441 and 1446. *See New York v. Trans World Airlines, Inc.*, 89 Civ. 2298 (RWS); *New York v. Pan Am. World Airways, Inc.*, 89 Civ. 2867 (RWS); *California v. Trans World Airlines, Inc.*, 89–00538–G(CM); *Kansas v. Trans World Airlines, Inc.*, 89–4080–S; *Texas v. Pan Am. World Airways, Inc.*, W–89–CA–136. In each case, the state attorney general moved to remand the action to state court.

Two federal courts already have ruled on the remand motions. On April 19, 1989, the Honorable Barefoot Sanders of the United States District Court for the Northern District of Texas, Dallas Division, declined to remand the action, stating:

> The Court is of the opinion that this case "arises under" federal law in that Plaintiff's complaint necessarily turns on some construction of federal law and implicates the federal government's pervasive regulation of the airline industry.

> *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 [103 S.Ct. 2841, 2846, 77 L.Ed.2d 420] (1983); *Gully v. First Nat'l*, 299 U.S. 109, 112 [57 S.Ct. 96, 97, 81 L.Ed. 70] (1936).

*Texas v. Pan Am. World Airways, Inc.*, No. 3–89–0713–H, slip op. at 1 (N.D.Tex. Apr. 19, 1989).

On September 5, 1989, the Honorable Earl B. Gilliam of the United States District Court for the Southern District of California reached the opposite conclusion, remanding California's action against TWA to state court in a ruling from the bench. He later issued a written opinion on September 13, 1989. *See California v. Trans World Airlines, Inc.*, No. 89–0538–G(CM), slip op. (S.D.Cal. Sept. 13, 1989).

On June 23, 1989, the airlines moved the JPML for an order pursuant to 28 U.S.C. § 1407 consolidating the removed federal actions with the Texas Federal Action. The JPML denied that motion on October 5, 1989, finding:

> Although we recognize that the actions in this litigation may involve some common questions of fact, we are not persuaded that these common questions of fact will predominate over individual questions of fact pertaining to various states' deceptive advertising claims. We find that the primary common thread in this litigation pertains to legal questions raised by the airline parties' defenses to the deceptive advertising claims. In these circumstances, the Panel concludes that Section 1407 transfer is not warranted.

*In re NAAG Air Travel Indus. Enforcement Guidelines Litig.*, No. 813, Slip op. at 1 (J.P.M.L. Oct. 5, 1989).

New York moved on April 28, 1989 pursuant to 28 U.S.C. § 1447(c) for an order remanding to state court the TWA State Action. New York moved on June 16, 1989 pursuant to 28 U.S.C. 1447(c), to remand the Pan Am State Actions and to dismiss

---

ments in the State of New York the fare shall be advertised in a single dollar amount which shall

include any 'surcharge.' "

pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R.Civ.P., the Pan Am Federal Action. TWA and Pan Am moved on June 26, 1989 for an order staying all three actions pending disposition of related litigation in the Western District of Texas or transferring these actions to the Western District of Texas pursuant to 28 U.S.C. § 1404(a). The motions were heard on May 26 and September 22, 1989. Except as noted below, the affidavits present no factual disputes.

## THE FACTS

### A. Airline Advertising Practices

Following deregulation in the airline industry commencing in the late 1970s, air fares dropped, the number of passengers increased, and airlines competed more intensely for shares of this expanding market. Among other things, this competition took the form of tour packages—often including airfare, hotel, and a rental car—announced in full-page advertisements appearing in newspapers throughout the country.

For example, on September 14, 1988, TWA ran a full page advertisement in The New York Times and other New York newspapers announcing a package trip to London, England that included airfare, hotel, and a rental car. The advertisement's headline read: "London Roundtrip + Hotel + Car = $298." The dollar figure appeared in boldface type approximately five inches high. According to the State, the headline implied that a consumer could travel to London, stay in a hotel, and rent a car for $298.

The small-print text below the headline and a footnote in minuscule type at the bottom of the page indicated that the $298 figure applied to a hotel in the English countryside, not London, and was available only to travelers who first paid for three consecutive nights in a London hotel. Although the footnote indicated that the package required a seven day minimum stay, the text stated that the free rental car applied for only three days, after which the traveler would have to pay "only $17 a day." The footnote stated that the fare did

not include United States departure tax, security surcharge, and custom fees totaling $23, and that the car rental charge omitted fuel surcharges, taxes, and optional items such as an automatic transmission. According to the State, these additional charges increased the package's cost to a minimum of $792 [$321 (airfare) + $450 (hotel) + $21 (car)] and a maximum of $1,418 [$321 (airfare) + $867 (hotel) + $253 (automatic transmission car)].

In March 1989, TWA ran another advertisement in The New York Times and other New York newspapers announcing packages to London and other overseas cities. The advertisement contained a large-print headline saying: "Let our low fares bring back the good old days," small print text and a smaller-print footnote setting forth the applicable restrictions and additional charges, and a boxed insert listing the one-way fares to various destinations, including London ($149), Rome ($299), Paris ($282), Milan ($264), Madrid ($246), Tel Aviv ($339), Lisbon ($246), Athens ($309), Frankfurt ($239), and Amsterdam ($239). The advertisement failed to indicate that—although the figures were for one-way fares—the prices applied only to roundtrip purchases. The small-print set forth the various restrictions and additional charges described above.

On April 6, 1989, Pan Am ran a newspaper advertisement offering "Eurosaver" fares to thirty-seven European and Middle-Eastern cities, ranging from Amsterdam to Zagreb. Pan Am listed the cities and their respective fares in two columns on either side of the advertisement under the headings "Eurosavers" and—in considerably smaller print—"Each Way." However, Pan Am offered the price only to consumers purchasing roundtrip tickets.

Claiming that its Eurosaver program offered "more than just a low airfare," Pan Am also announced "deals" on rental cars, hotels, restaurants, theatre, and more. It described as an example "an economy car in London ... with unlimited mileage for three days absolutely free." In small print appearing at the bottom of the page—described by the State as "mice type"—Pan

Am disclosed that the "absolutely free" rental car in fact would cost consumers fifteen percent of the normal rental price as a mandatory Value Added Tax and that additional charges might accrue for Collision Damage Waiver, insurance, gasoline, and a "drop-off" charge.

Pan Am promised hotels at "up to 50% off" for "as little as $31 a night in Paris, $39 in London, and $49 in Rome." The advertisement indicated that these prices were "per person based on double occupancy," which according to the State meant the hotel rooms in fact were available only at double the stated price. According to the State, only a small number of rooms were available in each city at the advertised price. For example, according to the State, in London some thirty-three hotels participated in the Pan Am promotion, but only one offered rooms at $39 per night, and even then that rate applied only to a few of its rooms. The other participating hotels charged as much as $312 a night, based on double occupancy.

### B. The NAAG Guidelines

Advertisements like these generated a rash of consumer complaints, usually filed with consumer protection bureaus under the aegis of state attorneys general according to the State. Responding to what it described as "the greatest consumer outcry against airlines that has ever existed," the National Association of Attorneys General ("NAAG") appointed a Task Force in June 1987 to "study the air travel industry and to present its findings, and any recommended course of action, to NAAG." After several months of study, the Task Force drafted "Guidelines for Air Travel Advertising" (the "Guidelines"). NAAG adopted the Guidelines on December 12, 1987, with the Attorneys General from New Mexico and Utah dissenting.

NAAG adopted the Guidelines to articulate the types of advertising practices that generally comply with state law. As the Task Force noted, the "Guidelines will be available to the air travel industry with the understanding that compliance with these standards will provide a reasonable assur-

ance of protection against a state enforcement action."

By creating this "safe harbor," NAAG stated it did not intend the Guidelines themselves to constitute enforceable rules of law. In its report, the Task Force stated repeatedly that enforcement power remained with individual states. For example, in the Executive Summary, the Task Force said:

> The state attorney general is the primary or exclusive enforcer of unfair or deceptive laws in most states. The proposed Guidelines are intended to express the general enforcement policies of the states as they relate to unfair and deceptive practices by airlines.
>
> The Guidelines are not an attempt at rulemaking and should not be considered as such. Rather, they are intended to be no more than a restatement of what is currently illegal under the laws of the various states, specifically applied to the practices of the airline industry.
>
> .... [I]ndividual attorneys general may ... vary or supplement these Guidelines in recognition of differences in their own state laws and in the exercise of their individual prosecutorial discretion.

Later in its report, the Task Force said: "It is important to note that these Guidelines do not create any new laws or regulations regarding the advertising practices or other business practices of the airline industry. They merely explain in detail how existing state laws apply to air fare advertising ... programs."

Section 2 of the Guidelines—entitled "Fare Advertisements"—detailed acceptable practices regarding disclosure in print, broadcast, and billboard advertisements, fare availability, surcharges, round trip fare advertising, and the use of "sale," "discount," "reduced," and similar terms.

### C. Federal Regulation of Airline Advertising

#### 1. The General Statutory Framework

Congress has regulated the air transportation industry since 1938, when it enacted the Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973 (the "CAA"). In 1958, Con-

gress passed the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731 (the "FAA"). This legislation imposed anti-competitive regulations—administered by the Civil Aeronautics Board (the "CAB")—to nurture the industry's early development.

In 1978, Congress overhauled airline regulation when it enacted the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (the "ADA"). The Senate Report accompanying the ADA stated that "[t]he time has come for major change in fundamental redirection as to the manner of regulation of interstate and overseas air transportation so as to place primary emphasis on competition."

In 1984, Congress enacted the Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98–443, 98 Stat. 1703 (the "Sunset Act"), which transferred administrative responsibility from the CAB to the Department of Transportation (the "DOT").

### 2. Statutory Provisions Governing Airline Advertising

Federal authority to regulate deceptive advertising derives from Section 411 of the FAA—entitled "Methods of competition"—which empowers the DOT to regulate "unfair or deceptive practices or methods of competition in air transportation or the sale thereof." 49 U.S.C.App. § 1381; *see also* January 19, 1989 Affidavit of Samuel Podberesky, Assistant General Counsel for Aviation Enforcement and Proceedings of the DOT ("Podberesky Jan. Aff."), ¶ 4.

Congress first enacted section 411 in 1938 as section 411 of the CAA, which it modeled after section 5 of the Federal Trade Commission Act (the "FTC Act").[3] *See Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). When Congress passed the FAA in 1958, it repealed and reenacted section 411. Congress left that

section unchanged when it adopted the ADA in 1978. When it passed the Sunset Act in 1984, however, Congress added subsection (b)[4] and transferred administrative responsibility over section 411 from the CAB to the DOT.

From its initial passage, section 411 served to supplement—not displace—state common law and statutory causes of action challenging deceptive practices in the airline industry. The FAA incorporated a savings clause that stated: "Nothing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C.App. § 1506. The Supreme Court has interpreted the savings clause as preserving state actions within section 411's purview, noting: "§ 411 confers upon the Board a new and powerful weapon against unfair and deceptive practices that injure the public. But it does not represent the only, or best, response to all challenged carrier actions that result in private wrongs." *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976). Moreover, Courts have interpreted section 411's model—section 5 of the FTC—as coexisting with state laws against deceptive advertising and trade practices. *See, e.g., American Fin. Servs. v. FTC*, 767 F.2d 957 (D.C.Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986).

Section 7275 of the Internal Revenue Code also regulates airline advertising regarding certain transportation taxes. That section provides:

(b) **Advertising.**—In the case of transportation by air all of which is taxable transportation (as defined in section 4262) or would be taxable transportation if section 4262 did not include subsection (b) thereof, any advertising made by or on behalf of any person furnishing such

---

**3.** Section 5 of the FTC declared unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." 15 U.S.C. § 45.

**4.** Subsection (b) provided: "Any air carrier may incorporate by reference in any ticket or other written instrument any of the terms of the contract of carriage in interstate and overseas air transportation, to the extent such incorporation by reference is in accordance with regulations issued by the Board."

transportation (or offering to arrange such transportation) which states the cost of such transportation shall—

(1) state such cost as the total of (A) the amount to be paid for such transportation, and (B) the taxes imposed by sections 4261(a), (b), and (c), and

(2) if any such advertising states separately the amount to be paid for such transportation or the amount of such taxes, shall state such total at least as prominently as the more prominently stated of the amount to be paid for such transportation or the amount of such taxes and shall describe such taxes substantially as: "user taxes to pay for airport construction and airway safety and operations."

26 U.S.C. § 7275(b).

### 3. Regulations Governing Airline Advertising

Pursuant to section 411, the CAB—and later the DOT—adopted regulations governing airline advertising. The principal rule in this area is 14 C.F.R. § 399.84, which provides:

The board considers any advertising or solicitation by a direct air carrier, indirect air carrier, or an agent of either, for passenger air transportation, a tour (i.e., a combination of air transportation and ground accommodations), or a tour component (e.g., a hotel stay) that states a price for such air transportation, tour, or tour component to be an unfair or deceptive practice, unless the price stated is the entire price to be paid by the customer to the air carrier, or agent, for such air transportation, tour, or tour component.

The CAB adopted section 399.84 in 1975 to apply to tour operators and amended it in 1984 to apply to all airfares. *See Alaska v. United States Dep't of Transp.*, 868 F.2d 441, 442 (D.C.Cir.1989). Since the Sunset Act, the DOT continues to enforce section 399.84. *See* Poderesky Jan. Aff. ¶ 4.

On November 14, 1985, the Air Transport Association of America asked the DOT to exempt from section 399.84 a $3 departure tax imposed by 26 U.S.C. § 4261(c). On December 24, 1985, the DOT's Assistant Secretary for Policy and International Affairs issued Order 85–12–68 granting the requested exemption and permitting advertisements to state the departure tax separately from the total advertised price, a practice known as "unbundling."

During 1986, the DOT's Consumer Office—which regularly reviewed air travel advertisements—determined that some airlines also had been listing newly enacted custom and immigration fees separate from the total advertised price. After considering possible enforcement action against these practices, the DOT determined to permit separate listing, reasoning that "it was consistent with the rationale behind Order 85–12–68 ... and the separate listings [the DOT] reviewed were clearly not deceptive." Podberesky Jan. Aff. ¶ 7. DOT staff informally advised the airlines of this determination.

Although the DOT's informal enforcement policy permitted unbundling of these fees and surcharges from late 1986, it did not issue a formal order until March 10, 1988 when it adopted Order 88–3–25. Order 88–3–25 amended the earlier Order 85–12–68—which had exempted the $3 departure tax from 14 C.F.R. § 399.84—to permit airlines to:

state foreign departure taxes, security charges, custom fees, immigration fees, security fees, agriculture inspection fees, tourism and fuel surcharges, as well as any other surcharges (when these items are collected by offeror) that may be imposed by the U.S. Federal, State or local governments or foreign governments, separately from other charges in advertisements and promotional materials, provided all such advertisements clearly and conspicuously state elsewhere in the advertisement the amount of such charges and the services such charges cover and indicate that such charges must be paid by the customer in addition to the advertised price.

In the aftermath of Order 88–3–25, airlines interpreted the phrase "other surcharges (when these items are collected by offeror) that may be imposed by the U.S.

Federal, State or local governments or foreign governments" to permit unbundling of surcharges designed to recoup charges the government imposed directly on the airlines as distinct from those it imposed on a per passenger basis. For example, some airlines had responded to higher fuel taxes by adding a fuel surcharge to the fare, then unbundling that surcharge in their advertisements.

On August 2, 1988, the DOT adopted Order 88–8–2—as a "Clarification of Amendment of Exemption"—to condemn this practice. That order provided:

> 1. We clarify Order 88–3–25 to exclude from the exemption it grants any price advertisement that lists government-imposed taxes, charges, fees, or surcharges separately when such taxes, charges, fees, or surcharges are not levied on individual passengers by a government entity and remitted directly to the levying government, and

> 2. We further clarify Order 88–3–25 to include in the coverage of its exemption not only security fees but any other carrier fee or surcharge that may be approved by the U.S. government for separate imposition on individual passengers.

After the DOT issued Orders 88–3–25 and 88–8–2, twenty seven states sued in federal court, alleging that these Orders violated section 553 of the Administrative Procedure Act, which invalidates "legislative" or "substantive" agency rules not promulgated through notice and comment procedures. *See* 5 U.S.C. § 553(b), (c); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). Although the DOT had adopted the departure tax exemption set forth in Order 85–12–68 through the same process, the states declined to challenge that Order. In *Alaska v. United States Dep't of Trans.*, 868 F.2d 441 (D.C.Cir.1989), the Court of Appeals for the District of Columbia upheld the states' challenge and invalidated Orders 88–3–25 and 88–8–2.

The DOT polices deceptive advertising under section 411 as follows:

The Department becomes aware of advertising problems in several ways. For example, the Consumer Office receives informal complaints from consumers regarding their problems with air carriers, including those related to advertising. During 1988, the Consumer Office received 23,844 complaints, 164 of which involved advertising. When a complaint involves a potential enforcement problem, the matter may be referred to the Investigation Division of that office for review. That Division also routinely reviews advertisements relating to air transportation in a number of newspapers and periodicals. Attorneys in [the Office for Aviation Enforcement and Proceedings], on a non-routine basis, also review airline advertisements for compliance with DOT requirements.

The Consumer Office, on occasion, will work with air carriers to correct advertisements with minor problems. In more serious cases, it refers matters to [the Office for Aviation Enforcement and Proceedings] for possible enforcement action. Each year, [Podberesky] will issue several warning letters to carriers in advertising cases and, in still other advertising cases, the carriers and [the Office for Aviation Enforcement and Proceedings] will enter into consent agreements involving cease and desist orders and, where appropriate, the payment by the carriers of civil penalties. In this connection, since 1987 the Department has issued 15 consent orders at [the behest of the Office for Aviation Enforcement and Proceedings] directing tour operators and air carriers to cease and desist from deceptive advertising (including deceptive price advertising). In any appropriate case where settlement is impossible, we would be forced to file a formal complaint against the carrier and seek sanctions through a formal adjudicatory proceeding.

June 1, 1989 Affidavit of Podberesky ("Podberesky June Aff.") ¶¶ 4–5.

On April 11, 1989, the DOT issued Order 89–4–25 settling on consent a DOT enforcement proceeding challenging a March 2, 1989 newspaper advertisement in which

Pan Am had listed separately (1) a United States Departure Tax, security charge, and customs fee of $23, (2) an additional government-approved security charge for Latin American destinations of $10, and (3) fuel surcharges of $2, $2.50, and $5 for domestic flights from Florida, Boston, and Chicago, respectively. The Order approved Pan Am's unbundling the first two charges, but assessed a $20,000 civil penalty for its separately listing the fuel surcharge. Noting that the District of Columbia Court of Appeals recently had overturned Orders 88–3–25 and 88–8–2, the DOT stated:

> Nevertheless, it has been the Department's consistent enforcement policy not to prosecute airlines for listing the surcharges specifically identified in these two 1988 orders separately, because we do not regard separate listing of these surcharges as an unfair or deceptive advertising practice. For this same reason, we plan to continue this enforcement policy, and we do not intend to take enforcement action against the type of advertisements allowed by the two 1988 orders.

Order 89–4–25 at 2 n. 1.

### 4. Other Listing and Posting Requirements Affecting Airlines

There are additional statutes and regulations governing the airlines' obligation to identify the various elements comprising the total fares their passengers pay. However, none of these provisions relates to advertising directed at the public.

Congress requires each air carrier to file "tariffs" with the DOT that set forth the contractual terms of carriage, including each carrier's rates, fares, and charges for international transportation. *See* 49 U.S.C. App. § 1373(a) (1982); 14 C.F.R. § 221.3 (1988). Congress further requires DOT to approve or reject the tariffs. *See* 49 U.S.C. App. § 1373 (1982); 14 C.F.R. § 221.180 (1988). The tariffs list separately fees, taxes, and other surcharges, and federal law requires that tariffs be "posted" and readily accessible for public inspection. 14 C.F.R. §§ 221.171–73 (1988).

Neither the posting nor the public access requirements relate to the airlines' obligations in advertising their fares to the public. The rules direct each carrier to post its tariffs at "stations, offices, or locations at which tickets for passenger transportation are sold." 14 C.F.R. § 221.171(a)(1). "A carrier will be deemed to have complied with the requirements that it 'post' tariffs, if it maintains at each station, office, or location a file in complete form of all tariff publications required to be posted...." *Id.* at § 221.171(b). The DOT requires airlines to make their tariffs available to the public as follows:

> Each file of tariffs shall be kept in complete and accessible form. Employees of the carrier shall be required to give any desired information contained in such tariffs, to lend assistance to seekers of information therefrom, and to afford inquirers opportunity to examine any of such tariffs without requiring the inquirer to assign any reason for such desire.

*Id.* at § 221.172.

Congress also imposes a $5 "customs services" fee on each passenger arriving "from a place outside the United States." 19 U.S.C. § 58c(a)(5). It requires that "[e]ach person that issues a document or ticket to an individual for transportation by a commercial vessel or commercial aircraft ... (A) collect from that individual the fee charged under subsection (a)(5) of this section at the time the document or ticket is issued; and (B) separately identify on that document or ticket the fee charged under subsection (a)(5) of this section as a Federal inspection fee." *Id.* at § 58c(d)(1). Similarly, Congress imposes a $5 fee for immigration inspection services, 8 U.S.C. § 1356(d), and requires that any "document or ticket" issued "identify" such fee. *Id.* at § 1356(f)(1)(B).

These provisions mandate separate identification on "a document or ticket" that is "issue[d] ... to an individual for transportation by a ... commercial aircraft." The word "document" cannot reasonably be interpreted to encompass advertisements to the public—the "document" on which an

advertisement appears is not "issue[d] to an individual for transportation by a ... commercial aircraft."

*The Motion to Stay or Transfer*

■ TWA and Pan Am have moved for an order staying the lawsuits before this court until the conclusion of the Texas Federal Action or transferring these actions to the Western District of Texas pursuant to 28 U.S.C. § 1404(a).

A federal court's power to stay proceedings before it "is incidental to the power inherent in every court to control the disposition of the causes on its docket...." *Landis v. North Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936). However, a court should not grant a stay too lightly—the party requesting a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay ... will work damage on some one else." *Id.* at 254–55, 57 S.Ct. at 166. Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it could have been brought."

Here, neither a stay nor a transfer is appropriate. At issue is New York's power to regulate under New York law airline advertising published in New York by Pan Am—a New York corporation—and TWA—a Delaware corporation with its principal place of business in New York. The fact that a Texas court may confront similar legal issues—which the Airlines have asserted as defenses—when assessing the validity of Texas laws against deceptive airline advertising published in Texas does not compel a stay or a transfer. *See In re NAAG Air Travel Indus. Enforcement Guidelines Litig.*, No. 813, Slip op. at 1 (J.P.M.L. Oct. 5, 1989).

*Motion to Dismiss the Pan Am Federal Action*

In its motion to dismiss the Pan Am Federal Action, New York argues that this court lacks subject matter jurisdiction, that the court should abstain in favor of a pending state court proceeding, and that each of Pan Am's causes of action fails to state a claim upon which relief can be granted.

### 1. Federal Question Jurisdiction Over the Pan Am Federal Action

■ Pan Am's complaint—which alleges violations of the Supremacy Clause, the Commerce Clause, the Compact Clause, and the First Amendment—seeks declaratory and injunctive relief barring New York from enforcing the Guidelines under New York law. Pan Am claims federal jurisdiction under 28 U.S.C. §§ 1331 and 1337. New York contends that there is no federal jurisdiction because Pan Am's complaint raises nothing more than defenses that anticipate a possible state court action. *See Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U.S. 1, 16–17, 103 S.Ct. 2841, 2849–50, 77 L.Ed.2d 420 (1983).

Pan Am has sued in federal court to bar enforcement of state regulations that it contends are preempted by the FAA. In *Shaw v. Delta Air Lines, Inc.*, the Supreme Court held: "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution must prevail, ... presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) (citations omitted); *see also Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 259 n. 6, 105 S.Ct. 695, 697 n. 6, 83 L.Ed.2d 635 (1985) (finding federal question jurisdiction where a plaintiff sought declaratory relief against a state law allegedly preempted by the Payment in Lieu of Taxes Act); *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 143–44 (2d Cir.1989) (finding federal question jurisdiction where a plaintiff sued for injunctive and declaratory relief against a state court escheat proceeding allegedly preempted by ERISA), *cert. denied*, — U.S. —, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); *Board of Elec. Light Comm'rs v. McCarren*, 725 F.2d 176, 178 (2d Cir.1983) (finding federal question jurisdiction where the plaintiff sought an injunction against a local licens-

ing board's action allegedly preempted by the Federal Power Act). Pursuant to these authorities, this court has jurisdiction over the Pan Am Federal Action.

### 2. Younger Abstention

■ Even though there is jurisdiction over Pan Am's claims, New York contends that the court should abstain from exercising that jurisdiction under the principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. In the Second Circuit, courts applying *Younger* abstention " 'must determine (1) whether there is an ongoing state proceeding; (2) whether an important state interest is involved; and (3) whether the federal plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the proceeding.' " *University Club v. City of New York,* 842 F.2d 37, 40 (2d Cir.1988) (quoting *Christ the King Regional High School v. Culvert,* 815 F.2d 219, 224 (2d Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987)). Because applying these factors to this case offers no clear guidance to whether abstention is appropriate, this court declines to abstain.

First, the state court proceeding against Pan Am is civil, not criminal. Traditionally, *Younger* abstention has applied to ongoing criminal proceedings, although the Supreme Court has expanded *Younger* protection to include civil enforcement proceedings, *see, e.g., Moore v. Sims,* 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (child custody proceeding); *Trainor v. Hernandez,* 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977) (action to recover public assistance payments allegedly obtained by fraud); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975) (nuisance action to close down movie theatre that exhibited obscene films), *reh'g denied,* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975), and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Public Serv., Inc. v. Council of New Orleans,* —— U.S. ——, 109 S.Ct. 2506, 2518, 105 L.Ed.2d 298 (1989) (citing *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 13, 107 S.Ct. 1519, 1527, 95 L.Ed.2d 1 (1987) (requirement for the posting of bond pending appeal); *Juidice v. Vail,* 430 U.S. 327, 336 n. 12, 97 S.Ct. 1211, 1217 n. 12, 51 L.Ed.2d 376 (1977) (civil contempt order)).

Arguably, New York's lawsuit against Pan Am constitutes a "civil enforcement proceeding"—the State seeks to punish Pan Am's alleged violation of New York's false advertising law through civil penalties and an injunction. However, this action differs in significant respects from other civil actions in which courts have abstained.

First, New York sued Pan Am in state court *after* Pan Am had commenced its federal action,[5] and Pan Am promptly removed that suit to federal court. The Supreme Court has recognized that *Younger* abstention still applies where a state proceeding begins subsequent to a federal action, provided there have been no "proceedings of substance on the merits" in the federal case. *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (abstaining where state summons issued some days following the federal complaint); *Giulini v. Blessing,* 654 F.2d 189, 193 (2d Cir.1981) (finding that federal dismissal for lack of jurisdiction was not a proceeding of "substance on the merits"). However, in all of the cases in which courts have abstained in favor of state *civil* proceedings, those state lawsuits had advanced substantially beyond the filing of a complaint.

Second, although New York has an interest in protecting its citizens from deceptive advertising, the regulation of airline advertising is an area in which both the state and

---

5. New York had issued a notice of suit to TWA, Continental, and British Airways and had sued TWA before Pan Am commenced its federal lawsuit—indicating that there was a substantial likelihood that it would sue Pan Am—but nothing in the record reveals that the State had taken formal action against Pan Am before the federal action began.

the federal government actively operate, and the federal government has the power—if it chooses to use it—to remove the state from this field entirely.[6]

With no clear guidance on the propriety of *Younger* abstention in this case, the court must revert to basic principles of federal jurisdiction. Recently, the Supreme Court reiterated that a· federal court's obligation to adjudicate claims within its jurisdiction is "virtually unflagging" and that abstention remains " 'the exception, not the rule.' " *New Orleans Public Serv., Inc.*, 109 S.Ct. at 2513 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988), and *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984)). Accordingly, this court declines to abstain and will rule on the merits of New York's motion to dismiss.

### 3. Standards Governing a Motion to Dismiss

A court should dismiss a complaint for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P., only if it appears beyond doubt that the plaintiff can prove no set of facts supporting its claim that entitles it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, — U.S. —, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A court must construe the complaint's allegations in the light most favorable to the plaintiff and accept those allegations as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Ass'n*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

### 4. The Supremacy Clause—Preemption

Pan Am's first claim for relief alleges that the federal government's role in regulating the air transportation industry under the FAA preempts New York's regulation of Pan Am's allegedly deceptive advertising.

When Congress legislates in an area traditionally regulated by the states—such as unfair and fraudulent business practices, *see California v. ARC Am. Corp.*, — U.S. —, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989); *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963), *reh'g denied*, 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963); *Chrysler Corp. v. Texas Motor Vehicle Comm'n*, 755 F.2d 1192, 1205 (5th Cir.1985), *reh'g denied*, 761 F.2d 695 (5th Cir.1985)—there is a presumption against finding preemption of state law. *See ARC Am. Corp.*, 109 S.Ct. at 1665 (citing *Hillsborough County*, 471 U.S. at 716, 105 S.Ct. at 2376). A party can overcome this presumption only by demonstrating a " 'clear and manifest [Congressional] purpose' " to supersede state law. *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

The Supreme Court has held that federal law may preempt state law by explicitly prohibiting state regulation in the area or—absent express statutory language—occupying the entire field, leaving no room for state regulation. Even where federal law has not completely preempted state regulation in one of these ways, state law is invalid to the extent it actually conflicts with federal law. *See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

#### a. Explicit Preemption

"Congress may explicitly define the extent to which it intends to pre-empt state law." *Michigan Canners & Freezers v. Agricultural Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S.

---

**6.** The relationship between the states and the federal government in regulating airline advertising is discussed more thoroughly in the preemption analysis below.

85, 95–96, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983)). The FAA—through section 105, headed "Federal Preemption" —expressly preempts state regulations as follows:

> no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier....

49 U.S.C.App. § 1305(a)(1) (Supp. IV 1986).

Pan Am contends that a court must give the phrase "relating to" its "broad common sense meaning," such that the FAA preempts any state law that "has a connection with or reference to" rates, routes, and services. Pan Am Mem. in Opp. to Motion to Dismiss at 18–19 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987)). Applying this definition, Pan Am argues that section 105 of the FAA preempts New York's regulation of allegedly deceptive advertising because such regulation "relates to" Pan Am's "rates, routes, and services."

However, any relationship between New York's enforcement of its laws against deceptive advertising and Pan Am's rates, routes, and services is remote and indirect. In challenging Pan Am's advertising, New York does not care about how much Pan Am charges, where it flies, or what amenities it provides its passengers. Its sole concern is with the manner in which Pan Am advertises those matters to New York consumers. Thus, as far as New York is concerned, Pan Am is free to charge $200 or $2,000 for a flight from LaGuardia to London, but it cannot take out a full-page newspaper advertisement telling consumers the fare is $200 if in fact it is $2,000. Similarly, Pan Am remains free to route a plane from Ithaca to Istanbul with as many stops in between as it chooses, but it cannot market that flight to New York consumers as a "direct" flight.

The interpretation of section 105 Pan Am urges on this court stretches that section's "relating to" phrase too far. To find that Congress intended section 105 of the FAA to preempt New York's laws against deceptive advertising conceivably could doom every state regulation affecting airlines. Under Pan Am's logic, for example, section 105 could bar a building code provision that increased the cost of its hanger facilities because that regulation added to its costs and—ultimately—the rates it charged its passengers.

The Ninth Circuit recognized the significance of this factor when it decided *Air Transport Ass'n of Am. v. Public Util. Comm'n of California*, 833 F.2d 200 (9th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). That case involved a challenge to a state regulation prohibiting third parties who owned their own telephone equipment from surreptitiously overhearing or recording conversations without notifying the parties to the conversation. The Air Transport Association of America and thirteen airlines— who monitored conversations between their reservations agents and members of the general public to ensure the agents provided accurate, efficient, and courteous information—sued, alleging in part that section 105 of the FAA preempted the regulation because it "related to" the airlines' "rates, routes, and services." The court rejected this contention, stating:

> The type of telephone operation utilized by the airlines is not peculiar to airlines, and is similar to those operations used by other national service industries where reservations are required, such as hotels and motels, and car rental companies. We are presented with nothing in the Deregulation Act or its history indicating that Congress intended totally to preempt state regulation of utilities insofar as such regulation affects airlines.

*Id.* at 207.

Accordingly, section 105 does not expressly preempt New York's enforcement of its law governing deceptive advertising.

See People v. Western Airlines, Inc., 155 Cal.App.3d 597, 600, 202 Cal.Rptr. 237, 238 (Cal.Ct.App.1984) ("[section 105] does not insulate Western from liability for violating California statutes prohibiting false advertising"), cert. denied, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 808 (1985); Brunwasser v. Trans World Airlines, Inc., 541 F.Supp. 1338, 1346 (W.D.Pa.1982) ("plaintiff's claims under both the common law of Pennsylvania and the Pennsylvania Unfair Trade Practices and Consumer Protection Law would remain unaffected by this federal regulation of air travel").

b. Implied Preemption

Absent express congressional language, a court may presume preemption where the federal statute's structure and purpose reveal "an intent to occupy an entire field of regulation." Michigan Canners & Freezers v. Agricultural Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 2522, 81 L.Ed.2d 399 (1984) (citing Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); Rice v. Santa Fe Elevator Corp., 331 U.S. at 230, 67 S.Ct. at 1152). Such implied preemption arises where the federal legislation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." International Paper Co. v. Ouellette, 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987) (quoting Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)).

As described above, Congress originally intended to share with the states regulatory authority over unfair and deceptive business practices when it enacted section 411. Pan Am does not deny this, but it contends that the situation changed when Congress passed the ADA in 1978 and the Sunset Act in 1984. However, none of the factors Pan Am points to supports a finding that Congress reversed its previous approach to state regulation of deceptive advertising in the airline industry.

Pan Am first contends that the amendments to section 102 of the FAA "specifically emphasized competition and, for the first time, established regulation of deceptive and anticompetitive practices as an important element of the overall congressional goal of promoting competition." Pan Am Mem. in Opp. to Motion to Dismiss at 25. The section relied upon provides in part:

(a) In the exercise and performance of its powers and duties under this Act with respect to interstate and overseas air transportation, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

\*    \*    \*    \*    \*    \*

(3) The availability of a variety of adequate economic, efficient and low-price services by air carriers without unjust discriminations, undue preferences or advantages, or unfair or deceptive practices....

(4) The placement of maximum reliance on competitive market forces and on actual and potential competition (A) to provide the needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital.

\*    \*    \*    \*    \*    \*

(7) The prevention of unfair, deceptive, predatory, or anticompetitive practices in air transportation, and the avoidance of—

(A) unreasonable industry concentration, excessive market domination, and monopoly power; and

(B) other conditions;

that would tend to allow one or more air carriers unreasonably to increase prices, reduce services or exclude competition in air transportation.

49 U.S.C.App. § 1302(a).

However, nothing in section 102 is inconsistent with a continued state presence in the field. In fact, other FAA sections support concurrent state and federal regulation. Most importantly, despite a fundamental shift in its approach to competition, Congress left section 411 and the savings

clause unchanged when it enacted the ADA. Although the ADA added section 105, Congress restricted preemption to regulations "relating to" rates, routes, and services, which—as discussed above—exclude state laws governing deceptive advertising.

Pan Am also contends that the legislative history underlying the amendment of section 411 to add subsection (b) in the Sunset Act of 1984 revealed Congress's intent to occupy the entire field of airline advertising. Under a section entitled "Consumer Protection and Unfair Competitive Practices," the House Report stated:

The Board's basic authority to protect consumers and ensure fair competition comes from a number of provisions in the Federal Aviation Act, including ... Section 411 of the act, giving the Board authority to proceed against unfair or deceptive practices or unfair methods of competition, Section 204(a) of the act, empowering the Board to enact regulations necessary under the Act, and Section 102, the declaration of policy which guides the Board in exercising its authorities. Acting under these authorities, the Board has promulgated regulations protecting consumers in such areas as overbooking and denied boarding compensation, limitations on liability for lost or damaged baggage, smoking, discrimination against the handicapped, terms of charter service, and the notice which airlines must give passengers of contractual terms between the passenger and the carrier. An important pending proceeding involving consumer protection and protection of airlines against unfair competitive practices is the Board's rulemaking to establish standards for the computer reservation systems which some airlines lease to travel agents.

The Committee believes that after CAB sunset there should continue to be authority in the Federal government to protect consumers against unfair and deceptive practices. Although these regulations touch relatively limited areas of airline operations they furnish important protections for consumers and we do not wish to see these regulations end precipitously when CAB sunsets. The authority now held by CAB (under section 411) duplicates authority which the Board holds under section 404 and other provisions permit it to deal with such problems as discrimination against the handicapped and smoking on aircraft. These problems involve important issues of health, passenger comfort, and social policy, and in these limited areas the solutions reached by the marketplace are not always acceptable.

*In addition to protecting consumers, federal regulation insures a uniform system of regulation and preempts regulation by the states. If there was no Federal regulation, the states might begin to regulate these areas, and the regulations could vary from state to state.* This would be confusing and burdensome to airline passengers, as well as to the airlines.

There is also a strong need to preserve the Board's authority under Section 411 to ensure fair competition in air transportation....

H.R.Rep. No. 793, 98th Cong., 2d Sess. 4 (1984), U.S.Code Cong. & Admin.News 1984, pp. 2857, 2860, (emphasis added).

However, these statements do not support preemption of state regulation regarding deceptive advertising. The Report listed the specific areas of regulation Congress was concerned with, including "overbooking and denied boarding compensation, limitations on liability for lost or damaged baggage, smoking, discrimination against the handicapped, terms of charter service, and the notice which airlines must give passengers of contractual terms between the passenger and the carrier." *Id.* It added that "these regulations touch relatively limited areas of airline operations...." *Id.*

Nowhere does the Report list deceptive advertising as an area requiring an exclusive federal presence. In fact, it implicitly excludes that area when it refers to the risk that states might "begin" to regulate—states already were regulating deceptive airline advertising, and courts were

upholding those regulations against preemption challenges. *See, e.g., People v. Western Airlines, Inc.,* 155 Cal.App.3d 597, 600, 202 Cal.Rptr. 237, 238 (Cal.Ct. App.1984). Moreover, unlike state law governing false advertising, the regulations the Report specifically lists fall within the ADA's preemption clause—each of those regulations indisputably "relates to" rates, routes, and services.

In light of the states' traditional power to regulate deceptive advertising—which had coexisted with federal participation in this area since 1938—an ambiguous reference in a House Report cannot support a finding that Congress suddenly had occupied the entire field. *See R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986) ("In undertaking [preemption] analysis, ... we must be mindful of the principle that 'federal regulation in the field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has *unmistakably so ordained.*' ") (emphasis added) (quoting *Florida Lime,* 373 U.S. at 142, 83 S.Ct. at 1277).

Finally, Pan Am contends that the DOT and the FTC have interpreted the ADA and the Sunset Act as occupying the entire field. To support this, they note that the DOT has stated in 14 C.F.R. § 399.110's preamble that Congress is "occupying the entire field of economic regulations"— which allegedly includes regulation of deceptive advertising—and in 14 C.F.R. § 399.111's preamble that "all of the carrier's operations are subject to Board jurisdiction." [7] Moreover, the FTC has criticized the Guidelines, noting that they could "substantially inhibit effective price competition among the airlines" and "might result in inconsistent federal and state regulation."

In fact, however, no clear message emanates from the regulatory agencies that Congress has occupied the entire field of airline advertising. In a letter responding to an initial draft of the Guidelines, the DOT "welcome[d] state assistance in policing and preventing misleading practices" and noted:

Air travelers have often benefited in the past from the vigorous actions of the states regarding fraudulent schemes or practices by some individuals or businesses. We hope this beneficial enforcement will continue as a priority.

Referring specifically to provisions requiring disclosure of restrictions in advertisements, the DOT stated:

In section 1 [the advertising section of the Guidelines], the Task Force attempts to ensure that more information about restrictions on airfares is given consumers in media advertisements and that such restrictions are clearly presented. In general, we have no objection to such Guidelines, since they are refinements of present Department policy to alert consumers about restrictions on fares.

Moreover, in a June 28, 1989 Report, the United States General Accounting Office stated:

To make better use of its limited resources, we recommend that the Secretary of Transportation ensure that DOT coordinate its consumer affairs functions with state offices. Such coordination could include a strategy for sharing information and coordinating rulemaking and enforcement activities with the states.

Accordingly, the statutes, legislative history, and administrative record have not established that Congress reversed its previous approach to state regulation of deceptive advertising in the airline industry when it enacted the ADA and the Sunset Act.

### c. Conflict Preemption

"[E]ven if Congress has not occupied the field, state law is nevertheless preempted to the extent it actually conflicts with federal law...." *California v. ARC Am. Corp.,* — U.S. ——, 109 S.Ct. 1661, 1665,

---

**7.** The Airlines additional arguments regarding the DOT's interpretation of preemption are addressed below in the section discussing alleged conflicts between state and federal regulation.

104 L.Ed.2d 86 (1989). An actual conflict arises when "compliance with both state and federal law is impossible," *id.* (citing *Florida Lime,* 373 U.S. at 142–43, 83 S.Ct. at 1217–18), or when " 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

### (i) Compliance With Both State and Federal Law

■ Pan Am contends that New York law is preempted to the extent it conflicts with DOT Orders permitting unbundling (including DOT Orders 85–12–68, 88–3–25, 88–8–2, and 89–4–25) and with statutes and regulations requiring airlines to identify separately fare components (including 19 U.S.C. § 58c(d)(1)(B), 8 U.S.C. § 1356(d) and (f)(1)(B), and 14 C.F.R. § 221.171–73 (1988)). As noted above, the statutes and regulations requiring airlines to identify fare components separately do not relate to advertisements. At issue, therefore, is the extent to which the DOT orders permitting unbundling preempt New York law.

As the Supreme Court has held, "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *accord Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (same). Where a federal agency promulgates a regulation intended to preempt state law, a court's review is limited to determining whether " 'it appears from the statute or its legislative history that the [regulation] is not one that Congress would have sanctioned.' " *Fidelity,* 458 U.S. at 154, 102 S.Ct. at 3023 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

Before undertaking this review, the validity of the DOT Orders permitting unbundling must be determined. As described above, the CAB promulgated 14 C.F.R. § 399.84 prohibiting unbundling in airline advertisements. In Orders 85–12–68, 88–3–25, and 88–8–2, the DOT carved out exemptions from this general rule for various per passenger charges the government imposed on the airlines. In Order 89–4–25, the DOT reiterated that it does not consider unbundling to constitute deceptive advertising.

However, the District of Columbia Court of Appeals has invalidated Orders 88–3–25 and 88–8–2, finding that they constituted "legislative" or "substantive" agency rules not promulgated through the notice and comment procedures required by section 553 of the Administrative Procedure Act (the "APA"). *See Alaska v. United States Dep't of Transp.,* 868 F.2d 441 (D.C.Cir. 1989). Orders 85–12–68 and 89–4–25 suffer the same infirmity, although a court has yet to invalidate them.

Pan Am argues that these Orders retain preemptive effect because they "reflect[ ] federal policy." Pan Am Mem. in Opp. to Motion to Dismiss at 38. These Orders may embody the DOT's enforcement policy under section 411 of the FAA—a matter soundly within its discretion—but that does not imbue them with sufficient power to preempt state law. As the Supreme Court has held: "regulations subject to the APA cannot be afforded the 'full force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act." *Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979).

However, even if the DOT had properly adopted rules permitting unbundling, a question might remain as to whether those rules are ones " 'that Congress would have sanctioned.' " *Fidelity,* 458 U.S. at 154, 102 S.Ct. at 3023 (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560). The FAA is silent on the propriety of unbundling. However section 7275(b) of the Internal Revenue Code, 26 U.S.C. § 7275(b)—the only federal statute expressly governing airline advertising—mandates that airline advertisements state the total cost, including transportation taxes. Significantly, as a per passenger charge the airlines collect, transportation taxes fall within the scope of the DOT's Orders permitting unbundling and

Order 85–12–68 directly conflicts with the statute. Moreover, at least since 1975 when the CAB promulgated 14 C.F.R. § 399.84 prohibiting unbundling, Congress has expressed no dissatisfaction with that policy.[8]

### (ii) Obstacle to Accomplishing Congress's Purposes

■ Pan Am contends that New York's enforcement of its regulations against false advertising creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), including the federal goals of deregulation, increased competition, uniformity of regulation, and a single (federal) voice in foreign affairs. However, state regulation of airline advertising threatens none of these goals.

Concurrent federal and state jurisdiction to regulate unfair or deceptive practices has been the norm since Congress first enacted section 411 in 1938. Throughout that period, Congress evidently perceived no threat to its regulatory or foreign affairs objectives from a state presence in this field because it declined to mandate exclusive federal control. Although Congress shifted its emphasis to deregulation and competition when it passed the ADA in 1978, it left section 411 and the savings clause intact, and it adopted a preemption clause that allowed continued state regulation of airline advertising. In this context, no threat to federal policies can be assumed.

Accordingly, Pan Am's preemption cause of action is dismissed at this time, given

the invalidation of its regulations described above.

### 5. The Commerce Clause

In its second cause of action, Pan Am alleges that New York's enforcement of its laws against deceptive advertising interferes with interstate and foreign commerce in violation of the Commerce Clause. The Commerce Clause empowers Congress "[t]o regulate commerce with foreign nations, and among the several states...." U.S. Const. art. I, § 8.

■ The Supreme Court has interpreted the Commerce Clause to limit the states' power to erect barriers against interstate commerce. *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). However, this limitation is not absolute—a state regulation comports with the Commerce Clause if it advances a significant state interest, regulates "evenhandedly" rather than in a discriminatory or protectionist way, and imposes only an "incidental" burden on interstate commerce, unless that burden "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *accord Northeast Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, — U.S. —, 109 S.Ct. 1262, 1282, 103 L.Ed.2d 509 (1989); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981), *reh'g denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981).

New York's desire to protect its citizens from deceptive advertising constitutes a significant state interest. *See Florida Lime*, 373 U.S. at 146, 83 S.Ct. at 1219; *Plumley v. Massachusetts*, 155 U.S. 461,

---

8. According to the State, no conflict exists between the DOT's enforcement policy and the State's requirement that advertisements state the total price, reasoning that an advertisement could list various charges separately as long as it also indicated the total price. However, the DOT's policy permits airlines to unbundle various charges without including them in the total price. Although the airlines could comply with New York law without violating the DOT Orders (which do not mandate unbundling), New York law deprives airlines of flexibility the DOT

sought to afford them, which might well constitute an actual conflict requiring preemption. *See Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 260–61, 105 S.Ct. 695, 697–98, 83 L.Ed.2d 635 (1985) (finding a preemptive conflict where a state law required counties to spend sixty percent of federal funds received under Payment in Lieu of Taxes Act for school districts, but federal law permitted counties to spend the funds "for any governmental purpose").

472, 15 S.Ct. 154, 158, 39 L.Ed. 223 (1894). Moreover, Pan Am makes no allegation that New York applies its laws against false advertising in a discriminatory or protectionist manner—indeed Pan Am is a New York corporation. Furthermore, because the State regulates airline advertising to protect New York consumers from unfair or deceptive practices, any resulting impact on interstate commerce is incidental to the regulation's primary goal.

Pan Am's principal contention is that the burden New York's regulation of airline advertising imposes on interstate commerce is "clearly excessive" when balanced against the State's interest in protecting its citizens. According to Pan Am, New York's regulation of airline advertising will impose a substantial burden on interstate commerce—to the extent New York's standards differ from those of other states, Pan will be forced to tailor its advertisements to comply with conflicting state laws, adopt advertisements that comply with the most restrictive regulations, or eliminate national advertising altogether.

Because the Guidelines represent an effort to eliminate the conflicting state standards Pan Am decries and because airline advertising by its nature tends to be tailored to different geographical markets, it is doubtful that the burden on interstate commerce will be sufficiently excessive to invalidate New York's laws governing airline advertising. However, a factual inquiry is required to weigh New York's interest in fair and truthful advertising against the degree of interference with interstate commerce. *See Kassel v. Consolidated Freightways*, 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978); *National Farmers Org. Irasburg v. Comm'r of Agric.*, 711 F.2d 1156 (2d Cir.1983). Such an inquiry cannot be made on a motion to dismiss.

■ Pan Am also contends that New York's enforcement of its laws against false advertising unduly burdens foreign commerce. To state a claim under this theory, Pan Am must allege facts indicating that New York law conflicts with an international aviation agreement. *See Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). According to Pan Am, New York's challenge to its advertising practices runs afoul of Article 12 of Bermuda 2, a bilateral executive agreement between the United States and the United Kingdom governing tariffs for airfares between the two countries. Pan Am contends that New York law conflicts with Bermuda 2 to the extent it runs counter to the obligations imposed by DOT Orders permitting unbundling (including DOT Orders 85–12–68, 88–3–25, 88–8–2, and 89–4–25) and to statutes and regulations requiring airlines to identify fare components separately (including 19 U.S.C. § 58c(d)(1)(B), 8 U.S.C. § 1356(d) and (f)(1)(B), and 14 C.F.R. § 221.171–73 (1988)). As discussed above in connection with the preemption analysis, New York law does not conflict with those statutes and regulations.

Accordingly, New York's motion to dismiss Pan Am's cause of action under the Commerce Clause is denied to the extent it alleges interference with interstate commerce but granted to the extent it asserts interference with foreign commerce.

### 6. The Interstate Compact Clause

■ Pan Am's third cause of action alleges that New York has violated the Interstate Compact Clause by agreeing to enforce the Guidelines through its state law without Congress's consent.

The Interstate Compact Clause provides: "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. Const. art. I, § 10, cl. 3. This clause applies to agreements between the states that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 471, 98 S.Ct. 799, 812, 54 L.Ed.2d 682 (1978) (quoting *New Hampshire v. Maine*,

426 U.S. 363, 96 S.Ct. 2113, 48 L.Ed.2d 701 (1976)). The Supreme Court has articulated the test for applying the Compact Clause as "whether the Compact enhances state power *quoad* the National Government." *Id.* at 473, 98 S.Ct. at 813. Accordingly, the Compact Clause applies only where the challenged interstate agreement embraces actions a state could not take acting alone. *See id.* at 464, 473–75, 98 S.Ct. at 808, 812–14.

Pan Am's claim under the Compact Clause turns upon its contention that "the regulation of airline advertising is a power within the *exclusive* domain of the federal government." Pan Am Mem. in Opp. to Motion to Dismiss at 42 (emphasis in original). However, as discussed above, the states enjoy concurrent jurisdiction with Congress to regulate airline advertising. Congress remains free to preempt state laws in this field, but to date it has declined to do so. The Guidelines may prove a more effective means than individual state action for regulating airline advertising, but that does not render them invalid. *See id.* at 476, 98 S.Ct. at 814. Because each state acting alone has the power to regulate in this field, coordinated state action poses no threat to federal supremacy and therefore does not violate the Compact Clause.

For these reasons, Pan Am's cause of action under the Interstate Compact clause is dismissed.

### 7. The First Amendment

In its fourth cause of action, Pan Am claims that New York's regulation of airline advertising violates its First Amendment right to free speech.

Pan Am's advertising constitutes commercial speech. The First Amendment protects commercial speech, provided the speech concerns a lawful activity and is not false or misleading. *See Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Council,*

425 U.S. 748, 771–72, 96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346 (1978). There is no dispute that commercial air travel constitutes a lawful activity. Pan Am contends that its advertising is not false or misleading because the DOT has determined that unbundling does not constitute a deceptive practice under section 411 and because one court has held that failure to provide complete price information in an advertisement does not deprive that advertisement of First Amendment protection. *See South Ogden CVS Store, Inc. v. Ambach*, 493 F.Supp. 374, 380 (S.D.N.Y.1980).

To the extent Pan Am seeks declaratory and injunctive relief generally barring New York from challenging airline advertising under section 350 of the General Business Law and section 63(12) of the Executive Law, the First Amendment affords Pan Am no remedy. Neither the DOT's enforcement policy permitting unbundling nor *South Ogden* immunizes all airline advertising from state challenge. Although the practice of unbundling various charges from the total price and listing them elsewhere on the page may not be misleading *per se*, it may become misleading in the context of a particular advertisement. If the separately listed items are legible only with a magnifying glass, for example, the advertisement may be deceptive.

Moreover, numerous other components of an advertisement apart from unbundling may render it deceptive. For example, New York has challenged advertisements that state "each way" fares when only roundtrip tickets are available, that promise "absolutely free" rental cars when various payments are required, that refer to "bargain" hotels with limited or nonexistent availability, and that announce single occupancy hotel prices where double occupancy is required. To the extent advertisements containing these representations may be misleading, they constitute unprotected speech.

Therefore, Pan Am can claim First Amendment protection only for particular advertisements—only then has Pan Am "spoken" in a form that a court can review to determine whether the advertisements

constitute protected commercial speech or unprotected false and misleading statements. Among the various forms of relief it requests in its complaint, Pan Am seeks an injunction prohibiting New York from "prosecuting any action against Pan Am or its agents, employees or representatives, pursuant to [General Business Law] § 350 or Executive Law § 63(12) or any other law of the State of New York, in respect of Pan Am's placing any advertisement with the same or similar content as Exhibit D to this complaint" [attached hereto as Exhibit D]. Pan Am Complaint Request for Relief (f).

Accordingly, Pan Am's claim under the First Amendment is dismissed, except to the extent it seeks an injunction barring New York from challenging Pan Am advertisements the same or similar to Exhibit D to the Complaint.

### D. Motion to Remand the TWA and Pan Am State Court Actions

■ In the TWA and Pan Am State Actions, New York sued the Airlines in state court, alleging that their advertising violated section 350 of the General Business Law and section 63(12) of the Executive Law. New York also charged Pan Am with breach of contract. The Airlines removed those suits to federal court under 28 U.S.C. § 1441(a), which provides: "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." New York has moved to remand them to state court under 28 U.S.C. § 1447(c), which states: "If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case...."

This court has original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In assessing whether a case removed from state court presents a federal question, the "well-pleaded complaint" rule requires the federal court to determine jurisdiction "from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 724–725, 58 L.Ed. 1218 (1914). A state complaint includes a federal question—and comes within a federal court's original jurisdiction—if "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims...." *Franchise Tax*, 463 U.S. at 13, 103 S.Ct. at 2848.

The Airlines' principal argument for removal is that federal law preempts New York's claims. However, "[f]ederal preemption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *accord Franchise Tax*, 463 U.S. at 14, 103 S.Ct. at 2848 ("since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption"). The Supreme Court has recognized as a "corollary of the well-pleaded complaint rule" that "Congress may so completely preempt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co*, 481 U.S. at 63–64, 107 S.Ct. at 1546–1547. However, as discussed above, the FAA has not completely preempted state regulation of airline advertising. The Airlines' remaining contentions under the Interstate Compact Clause, the Commerce Clause, and the First Amendment arise only as federal defenses, not as necessary elements of New York's causes of action.

Because no "substantial, disputed question of federal law" constitutes a "necessary element" of New York's state claims against the Airlines for false or deceptive advertising, persistent fraudulent conduct, or breach of contract, for the reasons set forth above the State's motion is granted

and the TWA and Pan Am State Actions are remanded to state court.

## CONCLUSION

For the reasons set forth above, New York's motion to remand the TWA and Pan Am State Actions is granted, its motion to dismiss the Pan Am Federal Action is granted in part and denied in part, and the Airlines' motion to stay or transfer these actions is denied. Settle judgment on notice.

It is so ordered.