STATE OF ALASKA, et al., Petitioners,

v.

U.S. DEPARTMENT OF TRANSPORTA-
TION and Samuel K. Skinner, Secre-
tary of Transportation, Respondents.

Nos. 88–1348, 88–1682.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1989.

Decided Feb. 28, 1989.

Stephen Gardner, Asst. Atty. Gen., New
York City, with whom Andrea C. Levine,
Brooklyn, N.Y., and Melvin L. Goldberg,
Asst. Atty. Gens., New York City, were
on the brief, for petitioners.

Steve Clark, James Tierney, Robert
Abrams, New York City, Kenneth O. Eik-
enberry, Olympia, Wash., Robert T. Ste-
phan and Arthur R. Weiss, Chicago, Ill.,
also entered appearances for petitioners.

Paul Samuel Smith, Atty., Dept. of
Transp., with whom Kenneth G. Starling,
Deputy Asst. Atty. Gen., John J. Powers,
III, David Seidman, Attys., Dept. of Jus-
tice, B. Wayne Vance, Gen. Counsel, Diane
R. Liff, Asst. Gen. Counsel for Litigation,
and Robert D. Young, Atty., Dept. of
Transp., Washington, D.C., were on the
brief, for respondents.

Kenneth N. Weinstein and Thomas L.
Ray, Attys., Dept. of Transp., Washington,
D.C., also entered appearances for respon-
dents.

Before ROBINSON, STARR and
BUCKLEY, Circuit Judges.

Opinion for the Court filed by
Circuit Judge STARR.

STARR, Circuit Judge:

Twenty-seven States challenge two 1988
Orders of the Department of Transporta-
tion concerning advertising by airlines.
The States launch a two-fold attack, con-
tending (1) that DOT was required to pro-
ceed through the notice-and-comment pro-
cedures ordained by the Administrative
Procedure Act, 5 U.S.C. § 553(b)(c) (1982),
and (2) that the Orders do not evince rea-
soned decisionmaking. DOT counters that
the States' assaults miss the mark and
that, more fundamentally, the States lack
standing to sue. Upon reflection, we are
persuaded that the States have standing
and that DOT unlawfully failed to follow
the requisite notice-and-comment proce-
dures.

## I

The two Orders under review concern the regulation of unfair and deceptive advertising under section 411 of the Federal Aviation Act. 49 U.S.C.App. § 1381 (1982). The Orders trace their origins to 1975, when the old Civil Aeronautics Board promulgated a rule requiring certain tour operators (specifically, the purveyors of "Group Inclusive Tours") to advertise either the total tour price or the price of the ground and airfare components of the tour package. 14 C.F.R. 399.84 (1975); J.A. at 2. The rule was aimed at eliminating deceptive advertising by requiring such advertisements to state a single price, or at most, two component prices. Subsequently, in response to complaints that many charter tour operators were featuring an attractive tour price in prominent type and setting forth a separate "percentage add-on" in small print, the CAB amended the rule in December 1984 just before closing its doors. J.A. at 16. The amended rule prohibited the "percentage add-ons" and extended the total price concept to airfares sold without a tour component. The amended version of the regulation provides:

> The Board considers any advertising or solicitation by a direct air carrier, indirect air carrier, or an agent of either, for passenger air transportation, a tour (*i.e.,* a combination of air transportation and ground accommodations), or a tour component (*e.g.,* a hotel stay) that states a price for such air transportation, tour or tour component, to be an unfair or deceptive practice, unless the price stated is the entire price to be paid by the customer to the air carrier, or agent, for such air transportation, tour, or tour component.

14 C.F.R. § 399.84 (1988). At the same time, the Board made a corresponding amendment to 14 C.F.R. § 380.30, which governs public charters. These changes to the 1984 regulations were accomplished through notice-and-comment procedures.

Thus matters stood until December 1985. By then, DOT had assumed responsibility for airline regulatory functions under the Civil Aeronautics Board Sunset Act of 1984, P.L. 98–443, 98 Stat. 1703 (1984) and 49 U.S.C.App. § 1551(b) (Supp.1985). Without recourse to notice-and-comment procedures, DOT issued an "Order Granting Exemption" from the amended 1984 regulations. J.A. at 77. The 1985 Order allowed advertisers to separate (or "unbundle") from the total price a $3 international departure tax that Congress had imposed in 1978, *see* 26 U.S.C. §§ 4261(c), 7275 (1982), so long as the amount of the tax was clearly stated elsewhere in the ad. J.A. at 77.

Over the next several years, the federal government imposed (or approved) additional surcharges for the provision of customs, immigration and security services. On March 10, 1988, DOT responded to these developments by issuing an "Order Amending Exemption." This Order provided that the recently-imposed government surcharges (and any similar charges imposed thereafter) would be granted the same exemption as that enjoyed by the international departure tax. J.A. at 87. In short, the initial 1988 Order allowed advertisers to exclude such charges from the total fare, provided that they were clearly stated elsewhere in the advertisement. On August 1, 1988, in an "Order Clarifying Amendment to Exemption," DOT restated its reasons for treating the new surcharges under the 1985 exemption Order and refused to extend the exemption to surcharges that were not collected by the government on a per passenger basis. J.A. at 98–99. Neither of the Department's 1988 Orders were issued pursuant to notice-and-comment procedures.

While those events were unfolding, various States were formulating their own position(s) on airline price advertising. On December 12, 1987, the National Association of Attorneys General adopted guidelines which provided that separate advertising of air travel surcharges was deceptive within the meaning of the various States' consumer protection laws. J.A. at 51. In February 1988, several States informed the airlines that they intended to enforce these laws. J.A. at 54–55. In response, DOT warned the States that "the Federal

government has preempted this aspect of state advertising regulation," and that "[i]f threats to enforce the particular sections of the Guidelines continue, we will be forced to consider taking formal legal action to prevent their enforcement." J.A. at 56–57. Shortly thereafter, on March 10, 1988, DOT issued its 1988 Order formally according the new government-imposed surcharges the same treatment as the $3 departure tax. J.A. at 87–88. The Department's clarification order limiting the exemption to per-passenger, government-imposed surcharges followed. Twenty-seven States responded by bringing this challenge to DOT's 1988 Orders.

## II

■ The Department's first line of defense targets the States' standing to sue. In particular, we are directed to the bedrock requirement that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1983) (citations omitted). Petitioners allege that, because DOT claims that its rules preempt state consumer protection statutes, the States have suffered injury to their sovereign power to enforce state law.[1] It is common ground that States have an interest, as sovereigns, in exercising "the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601, 102 S.Ct. 3260, 3265, 73 L.Ed. 2d 995 (1982). DOT urges, however, that the States' respective sovereignty interests

are not harmed in the present context because "[i]t is not at all clear that the consumer protection laws of any of the [petitioning States] would prohibit the kind of unbundling that the Department's policy finds to be non-deceptive." Respondent's Brief at 18. In support of its construction of state laws, DOT points, by way of example, to the lack of any specific mention of price advertising in the broadly worded Texas consumer protection statute. Texas Deceptive Practices Consumer Protection Act, Tex.Bus. & Com.Code § 17.46 *et seq.* (Vernon's 1987).

We decline DOT's invitation to reject, in the guise of standing analysis, the States' respective constructions of their own laws. The Department cites us to nothing in the various bodies of state decisional law that precludes or conflicts with the construction advanced by the States, represented by their chief law officers. In effect, DOT asks us to dismiss the States' claims on jurisdictional grounds because of some speculative possibility that the various Attorneys General do not understand state law. This we emphatically decline to do.

The Department also attempts to avail itself of the causation and redressability elements of Article III standing requirements. DOT argues that the 1988 Orders permitting separate listing of government surcharges "merely interpreted" the 1985 Order allowing separate listing of the departure tax. Brief of Respondent at 22. We are thus urged to conclude that "any preemption would neither be fairly traceable to the issuance of the two [1988] Or-

---

1. Petitioners also claim standing to sue, *parens patriae*, as the representative of state residents who would be injured by the preemption of state regulation. Reply Brief at 5. The precise contours of *parens patriae* standing, however, are somewhat unclear. In the most recent Supreme Court case on the subject, a majority could not agree on the prerequisites for this genre of standing. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). In particular, four concurring Justices argued that ("[a]t the *very* least, the prerogative of states to bring suit in federal court should be commensurate with the ability of private organizations.") (Brennan, J., concurring). *Id.* at 611, 102 S.Ct. at 3271. Similar uncertainties have surfaced in our own circuit.

*See, e.g., Barnes v. Kline*, 759 F.2d 21, 49 n. 8 (D.C.Cir.1985) (Bork, J., dissenting) (Article III requires that the citizens themselves would have standing to represent the interests advanced by the state); *Pennsylvania v. Kleppe*, 533 F.2d 668, 673 (D.C.Cir.1976) ("no monolithic principle of *parens patriae* standing can be formulated"). The question becomes more complex where, as here, a state sues the federal government. *Maryland People's Counsel v. FERC*, 760 F.2d 318, 321–22 (D.C.Cir.1985) (cautioning that Congress' power to confer *parens patriae* standing may be limited). Inasmuch as the States' sovereign interest in law enforcement is sufficient to support standing, we need not delve into the issue of *parens patriae* standing.

ders, nor redressable by an order of this court overturning the Orders." *Id.* In support of this proposition, the Department points out that its preemption threat preceded the 1988 Orders and explains that since 1986 it has informally permitted separate listing of government surcharges other than the departure tax. *Id.;* J.A. at 91, 93–94.

Upon analysis, DOT's modest portrayal of its 1988 Orders is inconsistent with both the amended 1984 regulations and the Department's own statements. The 1984 regulations promulgated by CAB unambiguously state that advertisements are considered deceptive "unless the price stated is the entire price to be paid by the customer to the air carrier, or agent, for such air transportation ..." J.A. at 17. The Department, moreover, explicitly recognized this in its first 1988 Order: "[F]or advertisers to comply literally with [the 1984 regulations], they are obligated to include the total cost of all such fees and charges in the advertised price." J.A. at 86. It is thus difficult to accept DOT's assertion that the 1988 Orders "merely interpreted" the 1985 Order. From all that appears, the 1985 Order carved out a narrow exception to the 1984 regulations, allowing separate listing *only* of the departure tax. Indeed, the second 1988 Order speaks of "broadening" (not merely interpreting) the 1985 Order. J.A. at 97. Having recognized in 1988 the need, in light of the 1984 regulations, to formalize further exemptions, the DOT cannot now be heard to claim that such exemptions were superfluous.

In sum, even granting considerable deference to the agency's view of its regulations, *Jewett v. Comm'r,* 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982), we cannot accept DOT's contention that the 1985 Order blue-penciled out all government-imposed surcharges from the 1984 regulations. This conclusion dooms DOT's

argument that petitioners' injury is neither caused by the 1988 Orders nor redressable by this court. If the 1988 Orders are invalidated, the States will be left with the 1984 regulations and the 1985 Order, which together permit separate listing *only* of the departure tax. It does not matter, therefore, that DOT's threat to preempt state regulation of price advertising preceded the 1988 Orders. The 1988 Orders (to the extent they are valid and thus modify the 1984 regulations) provide the only possible basis for preemption of state regulation of surcharges other than the departure tax. Inasmuch as this preemptive effect is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III.[2]

Nor does recognizing the States' standing as sovereigns run afoul of prudential concerns. Consideration of prudential limits can be pretermitted by a contrary Congressional intent, for "Congress can ... resolve the question [of standing] one way or another, save as the requirements of Article III dictate otherwise." *Ass'n of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (citations omitted). In this respect, we conclude that Congress has expressly contemplated that States may be heard to complain of injury inflicted by the Orders. Section 1006 of the Federal Aviation Act provides that "any person disclosing a substantial interest" in an order under the Act is entitled to judicial review. 49 U.S.C.App. 1486(a) (1982). The statute's definition of such persons includes "a body politic" or a "representative thereof." 49 U.S.C.App. § 1301(29) (1982).

The Department contends that the term "body politic" is not sufficient, in itself, to indicate that Congress contemplated state suits. We fail to see why not. It cannot be gainsaid that the ordinary meaning of "body politic" encompasses States. *See,*

---

**2.** Nor is petitioners' standing affected by the fact that, since 1986, DOT has not enforced the 1984 regulations against advertisers who excluded surcharges other than the three-dollar departure tax from the total price. J.A. at 74. The stringency with which DOT enforces its own regulations is a matter unrelated to the question

whether the DOT may prevent the States from enforcing *their* laws. The preemptive injury of which petitioners complain is thus traceable to the 1988 Orders notwithstanding DOT's (non)-enforcement posture as to surcharges other than the departure tax.

*e.g.,* Black's Law Dictionary, 159 (5th ed. 1979) (defining "body politic" as a "state, nation or public association"). Indeed, in our federal system it seems to us that the several States are singularly likely to be the "body politic" foremost in the minds of members of Congress. *Cf. Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 551 n. 11, 105 S.Ct. 1005, 1017 n. 11, 83 L.Ed.2d 1016 (1984) citing, Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Col. L. Rev. 543 (1954). Finally, DOT offers no alternative interpretation of "body politic" consistent with its view that Congress intended to exclude state suits.[3]

## III

■ We come now to the merits. A highly familiar provision of law in the modern administrative state is section 553 of the Administrative Procedure Act, which provides that certain agency rules [4] cannot be given effect unless promulgated through notice-and-comment procedures. 5 U.S.C. § 553(b), (c) (1982). *See also Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). Agency rules subject to this requirement are termed "legislative" or "substantive," to distinguish them from "interpretative rules" or "general statements of policy," which are excepted from such procedures. 5 U.S.C. § 553(b)(3)(A) (1982). The present dispute centers on whether the 1988 Orders are legislative rules, invalid for want of APA-ordained rulemaking procedures. Our task is considerably aided, however, by virtue of both sides having grounded their arguments squarely on our decision in *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C.Cir.1987). For reasons that we shall now set forth, DOT's actions are strikingly similar to (and in all principled respects, the same as) that deemed to constitute a legislative rule in *Community Nutrition Institute;* we therefore conclude that the 1988 Orders are invalid by virtue of the Department's failure to employ notice-and-comment procedures.

To recall briefly the operative facts of our earlier case: *Community Nutrition Institute* involved regulations of the Food and Drug Administration designed to limit the amount of "poisonous and deleterious substance added to any food." 21 U.S.C. § 346 (1982). The FDA's regulations set "action levels" for food contaminants, and producers whose products showed contamination above the relevant action level were subject to FDA enforcement proceedings. 21 C.F.R. § 109.4 (1986). The question in the case was whether the FDA's action level for aflatoxin, a contaminant found in corn, constituted a legislative or interpretative rule. We began our analysis by noting that, while an interpretative rule "does not impose any rights and obligations" and "genuinely leaves the agency ... free to exercise discretion," a legislative rule is recognizable by virtue of its binding effect.

---

**3.** Since we conclude that the Aviation Act expressly includes the States within the class of "aggrieved" persons entitled to judicial review, we need not discuss petitioners' status as a proper party under section 702 of the Administrative Procedure Act. 5 U.S.C. § 702 (1982) (conferring standing on "[a] person ... aggrieved by agency action within the meaning of a relevant statute"). Section 702 has been interpreted, broadly, as providing for review by any party "arguably within the zone of interests to be protected or regulated by the statute...." *Ass'n of Data Processing Service Organizations v. Camp,* 397 U.S. at 153, 90 S.Ct. at 830, 25 L.Ed.2d 184 (1970). We note in passing that several courts have, under this standard, discerned Congressional approval of state suits challenging agency action. *Ohio ex. rel. Celebrezze v. DOT,* 766 F.2d 228 (6th Cir.1985); *Washington Utils. & Tran. Comm'n v. FCC,* 513

F.2d 1142 (9th Cir.1975), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *see also Florida v. Weinberger,* 492 F.2d 488 (5th Cir. 1974) (finding state standing to challenge regulatory preemption without discussing Congressional intent).

**4.** A "rule" is defined in the APA as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ..." 5 U.S.C. § 551(4) (1982); *see also Bowen v. Georgetown Univ. Hosp.,* — U.S. —, 109 S.Ct. 468, 475–80, 102 L.Ed.2d 493 (1988) (interpreting the APA definition of "rule" to prohibit retroactive application of a rule.) (Scalia, J., concurring). DOT concedes, as it must, that its 1988 Orders are "rules" under the APA.

*Community Nutrition Institute,* 818 F.2d at 945–46 (citations omitted); *see generally* Saunders, Agency Interpretations and Judicial Review: A Search for Limitations in the Controlling Effect Given Agency Statutory Constructions, 30 Ariz. L. Rev. 769 (1988) (discussing the significance of the legislative-interpretative distinction).

This definitional principle, however, is hardly self-executing. We therefore considered several factors before reaching our ultimate conclusion that the action level constituted a legislative rule. *First,* we focused on the language actually used by the agency in the course of creating the regulations at issue. At the time of their establishment, the FDA had stated that action levels "define the level of contamination at which food will be deemed to be adulterated." *Community Nutrition Institute,* 818 F.2d at 947, citing 21 C.F.R. § 109.4 (1986). This type of mandatory language was regarded as a "powerful" indication that the action levels were substantive. *Id. Second,* we observed that the agency had granted *exemptions* from the action levels. The perceived need for "exemptions" reinforced our understanding that the FDA had intended the action levels to have a binding effect. *Id. Third,* we drew guidance from the FDA's informal declarations that food containing aflatoxin in excess of the action level "is considered by the FDA to be adulterated under section 402(a)(1) of [the FDA Act]." *Id.* at 947–48, citing 46 Fed.Reg. 7447 (1981).

*Fourth,* we considered the "publication factor," that is, whether the regulation had been published in the Code of Federal Regulations. Publication in C.F.R. (as opposed to the Federal Register) is a probative sign that a rule is substantive. *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 539 (D.C.Cir.1986). The FDA had not published the aflatoxin regulation in C.F.R., but regulations authorizing the establishment of action levels had been published in the Code. We thus found the import of the "publication factor" inconclusive. *Id.* 818 F.2d at 947 n. 8. *Fifth,* we asked whether the action level was a "classic legislative rule," the violation of which would, without more, establish violation of the statute in a

subsequent enforcement proceeding. *Id.* 948. Under the agency's organic statute, action levels did not have this effect because FDA was required in all instances to prove that the food in question was "adulterated" within the meaning of the operative provision of law. 21 U.S.C. § 342 (1982).

Recognizing that action levels were not "classic legislative rules" with "the force of law," *see Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974), we pointed out that action levels bound the FDA, albeit in a more attenuated sense. Specifically, the action levels limited the FDA's prosecutorial discretion because "it would be daunting indeed to try to convince a court that the agency could appropriately prosecute a producer" who had complied with the levels prescribed by the action level. *Community Nutrition Institute,* 818 F.2d at 948. Inasmuch as the action level for aflatoxin had been set forth in mandatory terms and producers had been required to obtain exemptions, we concluded that this lesser impact on agency discretion was sufficient to render the action level a legislative rule. *Id.* at 949.

With *Community Nutrition Institute* firmly in mind, we return to the case at hand. DOT's primary contention is that the earlier (CAB) regulations, and hence the 1988 Orders interpreting the regulations, are, under our holding in *Community Nutrition Institute,* non-legislative, interpretative rules. We think not. As we alluded to earlier, the Department's 1988 Orders are strikingly similar in purpose and effect to the action levels considered in *Community Nutrition Institute.* Here, briefly, are the reasons why we find this case to be governed by that decision. First, the 1984 regulations state in mandatory language: "The Board considers any advertising or solicitation ... to be an unfair and deceptive practice, unless the price stated is the entire price to be paid by the customer to the air carrier, or agent ..." 14 C.F.R. § 399.84 (1988). Indeed, the 1985 Order recognized that "failure to comply [with the 1984 regulations] is an unfair or deceptive trade practice under section 411 of the Federal Aviation Act." J.A. at 77. The 1988 Orders reiterate DOT's opinion

that the 1984 regulations constitute statutory minima. J.A. at 85, 96. DOT has, in short, continuously viewed its 1984 advertising regulations in obligatory terms.

Second, similarly to *Community Nutrition Institute*, DOT characterized its pronouncements on price advertising as an "Order Granting Exemption," an "Order Amending Exemption" and an "Order Clarifying Amendment to Exemption." J.A. at 77, 85, 96. Moreover, DOT's Orders are crafted like exemptions; they speak of eliminating specific obligations. For example, the 1985 Order stated that "we have decided to grant the request ... for an exemption from [the 1984 regulations] to permit the exclusion of the U.S. international departure tax from the total advertised price." J.A. at 82. So too, the initial 1988 Order "allows advertisers to separately list certain fees and taxes in advertisements." J.A. at 85. In like manner, the second 1988 Order stated that, as surcharges not imposed on a per-passenger basis were not covered under the initial 1988 Order, "[w]e continue to regard separate listing of these government-imposed surcharges as an unfair and deceptive practice within the meaning of section 411." J.A. at 99. The granting of these specific (and limited) exemptions undermines DOT's characterization of the 1984 regulations as mere hortatory norms.

As with the action levels in *Community Nutrition Institute*, then, DOT's 1984 regulations and subsequent Orders purport to set forth bright-line tests to shape and channel agency enforcement. The 1988 Orders "permit" advertisers to list separately what previously had been mandated for inclusion in the total price. As in *Community Nutrition Institute*, we believe that DOT would be hard-pressed to justify the prosecution of advertisers who comply with DOT's rules. The "publication factor" articulated in *Cathedral Bluffs* and considered in *Community Nutrition Institute* further reinforces this conclusion. In sum, the use of mandatory language cabining DOT's enforcement discretion; DOT's practice of granting "exemptions"; and its decision to publish the 1984 rules in C.F.R. combine to lead us to the conclusion that the 1988 Orders constitute legislative rules.

DOT also contends that, even assuming the 1984 regulations are substantive rules, petitioners must challenge the 1985 departure tax, since the 1988 Orders merely extend the international departure tax approach to recently-imposed government surcharges. Not so. In addition to our earlier analysis, *see supra* at pp. 443–444, we see no basis in law for requiring a party, on pain of some sort of ersatz waiver, to mount a challenge to a practice that is not perceived by the party to warrant the initiation and maintenance of litigation. It may well be that the States did not admire the earlier order, but were nonetheless not stirred to action (in light of scarce resources and the like) until it became clear (as the States see it) that more than the camel's nose had made its way into the tent. Whatever their sentiments toward the 1985 Order, the States viewed the 1988 Orders as unleashing a veritable floodtide of special exemptions. We see no basis for concluding that, simply because they failed to repair to the courthouse at the first appearance of rain, the States have somehow waived their sovereign interests even though (as they see it) the floodtide is now engulfing them.

\* \* \* \* \* \*

For the reasons stated above, the petitions for review are

GRANTED.