995 F.2d 1106
 302 U.S.App.D.C. 38, 1993 O.S.H.D. (CCH) P 30,096
 AMERICAN MINING CONGRESS and National Industrial Sand
Association, Petitioners,
v.
MINE SAFETY & HEALTH ADMINISTRATION and U.S. Department of Labor,
AMERICAN MINING CONGRESS, and National Industrial Sand
Association, Petitioners,
v.
U.S. DEPARTMENT OF LABOR and William J. Tattersall,
Assistant Secretary of Labor for Mine Safety and
Health, and Mine Safety and Health
Administration, Respondents.
 Nos. 91-1501, 92-1188, 92-1331.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 10, 1992.
Decided June 15, 1993.
Rehearing and Suggestion for Rehearing
En Banc Denied in No. 91-1501
Sept. 8, 1993.
 
 [302 U.S.App.D.C. 39] Petitions for Review of an Order of the Mine Safety and Health Administration.
 Thomas C. Means, Washington, DC, argued the cause for petitioner. With him on the briefs were Edward M. Green, Mark G. Ellis, Timothy M. Biddle and Robert Timothy McCrum, Washington, DC.
 Marshall J. Breger, Solicitor, Dept. of Labor, Washington, DC, argued the cause for respondent. With him on the brief were Allen H. Feldman, Nathaniel I. Spiller & Marks, Flynn, W. Christian Schumann and Jerald S. Feingold, Washington, DC.
 Before: WILLIAMS, SENTELLE and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 This case presents a single issue: whether Program Policy Letters of the Mine Safety and Health Administration, stating the agency's position that certain x-ray readings qualify as "diagnose[s]" of lung disease within the meaning of agency reporting regulations, are interpretive rules under the Administrative Procedure Act. We hold that they are.
 
 
 2
 * * * * * *
 
 
 3
 The Federal Mine Safety and Health Act, 30 U.S.C. § 801 et seq., extensively regulates health and safety conditions in the nation's mines and empowers the Secretary of Labor to enforce the statute and relevant regulations. See id. at §§ 811, 813-14. In addition, the Act requires "every operator of a ... mine ... [to] establish and maintain such records, make such reports, and provide such information, as the Secretary ... may reasonably require from time to time to enable him to perform his functions." Id. at § 813(h). The Act makes a general grant of authority to the Secretary to issue "such regulations as ... [he] deems appropriate to carry out" any of its provisions. Id. at § 957.
 
 
 4
 Pursuant to its statutory authority, the Mine Safety and Health Administration (acting on behalf of the Secretary of Labor) maintains regulations known as "Part 50" regulations, which cover the "Notification, Investigation, Reports and Records of Accidents, Injuries, Illnesses, Employment, and Coal Production in Mines." See 30 CFR Part 50. These were adopted via notice-and-comment rulemaking. See 42 Fed.Reg. 55568 (1977) (notice of proposed rulemaking); 42 Fed.Reg. 65534 (1977) (adopted rules).[1] Subpart C deals with the "Reporting of Accidents, Injuries, and Illnesses" and requires mine operators to report to the MSHA within ten days "each accident, occupational injury, or occupational illness" that occurs at a mine. See 30 CFR § 50.20(a). Of central importance here, the regulation also says that whenever any of certain occupational illnesses are "diagnosed," the operator must similarly report the diagnosis within ten days. Id. (emphasis added). Among the occupational illnesses covered are "[s]ilicosis, asbestosis, coal worker's pneumoconiosis, and other pneumoconioses." Id. at § 50.20-6(b)(7)(ii). An operator's failure to report may lead to citation and penalty. See 30 U.S.C. §§ 814(a), 815(a) & (d), 816(a).
 
 
 5
 As the statute and formal regulations contain ambiguities, the MSHA from time to time issues Program Policy Letters ("PPLs") intended to coordinate and convey agency policies, guidelines, and interpretations to agency employees and interested members of the public. See MSHA Administrative Policy and Procedures Manual, Volume II, paragraph 112 (July 17, 1990); MSHA Program Information Bulletin No. 88-03 (August 19, 1988). One subject on which it has done so--apparently in response to inquiries from mine operators about whether certain x-ray [302 U.S.App.D.C. 40] results needed to be reported as "diagnos[es]"--has been the meaning of the term diagnosis for purposes of Part 50.
 
 
 6
 The first of the PPLs at issue here, PPL No. 91-III-2 (effective September 6, 1991), stated that any chest x-ray of a miner who had a history of exposure to pneumonoconiosis-causing dust that rated 1/0 or higher on the International Labor Office (ILO) classification system would be considered a "diagnosis that the x-rayed miner has silicosis or one of the other pneumonoconioses" for the purposes of the Part 50 reporting requirements. (The ILO classification system uses a 12-step scale to measure the concentration of opacities (i.e., areas of darkness or shading) on chest x-rays. A 1/0 rating is the fourth most severe of the ratings.) The 1991 PPL also set up a procedure whereby, if a mine operator had a chest x-ray initially evaluated by a relatively unskilled reader, the operator could seek a reading by a more skilled one; if the latter rated the x-ray below 1/0, the MSHA would delete the "diagnosis" from its files. We explain the multiple-reader rules further in the context of the third PPL, where they took their final form (so far).
 
 
 7
 The second letter, PPL No. P92-III-2 (effective May 6, 1992), superseded the 1991 PPL but largely repeated its view about a Part 50 diagnosis. In addition, the May 1992 PPL stated the MSHA's position that mere diagnosis of an occupational disease or illness within the meaning of Part 50 did not automatically entitle a miner to benefits for disability or impairment under a workers' compensation scheme. The PPL also said that the MSHA did not intend for an operator's mandatory reporting of an x-ray reading to be equated with an admission of liability for the reported disease.
 
 
 8
 The final PPL under dispute, PPL No. P92-III-2 (effective August 1, 1992), replaced the May 1992 PPL and again restated the MSHA's basic view that a chest x-ray rating above 1/0 on the ILO scale constituted a "diagnosis" of silicosis or some other pneumoconiosis. The August 1992 PPL also modified the MSHA's position on additional readings. Specifically, when the first reader is not a "B" reader (i.e., one certified by the National Institute of Occupational Safety and Health to perform ILO ratings), and the operator seeks a reading from a "B" reader, the MSHA will stay enforcement for failure to report the first reading. If the "B" reader concurs with the initial determination that the x-ray should be scored a 1/0 or higher, the mine operator must report the "diagnosis". If the "B" reader scores the x-ray below 1/0, the MSHA will continue to stay enforcement if the operator gets a third reading, again from a "B" reader; the MSHA then will accept the majority opinion of the three readers.
 
 
 9
 The MSHA did not follow the notice and comment requirements of 5 U.S.C. § 553 in issuing any of the three PPLs. In defending its omission of notice and comment, the agency relies solely on the interpretive rule exemption of § 553(b)(3)(A).
 
 
 10
 We note parenthetically that the agency also neglected to publish any of the PPLs in the Federal Register, but distributed them to all mine operators and independent contractors with MSHA identification numbers, as well as to interested operator associations and trade unions. Compare 5 U.S.C. § 552(a)(1)(D) (requiring publication in the Federal Register of all "interpretations of general applicability") with id. at § 552(a)(2)(B) (requiring agencies to make available for public inspection and copying "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register"). Petitioners here make no issue of the failure to publish in the Federal Register.
 
 
 11
 * * * * * *
 
 
 12
 The distinction between those agency pronouncements subject to APA notice-and-comment requirements and those that are exempt has been aptly described as "enshrouded in considerable smog," General Motors Corporation v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (quoting Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.1975)); see also American Hospital Association v. Bowen, 834 F.2d 1037, 1046 (D.C.Cir.1987) (calling the line between interpretive and legislative rules "fuzzy"); Community Nutrition Institute v. Young, 818 F.2d 943, 946 (D.C.Cir.1987) (quoting authorities describing [302 U.S.App.D.C. 41] the present distinction between legislative rules and policy statements as "tenuous," "blurred" and "baffling").
 
 
 13
 Given the confusion, it makes some sense to go back to the origins of the distinction in the legislative history of the Administrative Procedure Act. Here the key document is the Attorney General's Manual on the Administrative Procedure Act (1947), which offers "the following working definitions":
 
 
 14
 Substantive rules--rules, other than organizational or procedural under section 3(a)(1) and (2), issued by an agency pursuant to statutory authority and which implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission pursuant to section 14 of the Securities Exchange Act of 1934 (15 U.S.C. 78n). Such rules have the force and effect of law.
 
 
 15
 Interpretative rules--rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers....
 
 
 16
 General statements of policy--statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.
 
 
 17
 Id. at 30 n. 3. See also Michael Asimow, Public Participation in the Adoption of Interpretive Rules and Policy Statements, 75 Mich.L.Rev. 520, 542 & n. 95 (1977) (reading legislative history of Administrative Procedure Act as "suggest[ing] an intent to adopt the legal effect test" as marking the line between substantive and interpretive rules).
 
 
 18
 Our own decisions have often used similar language, inquiring whether the disputed rule has "the force of law". See, e.g., National Latino Media Coalition v. FCC, 816 F.2d 785, 787-88 (D.C.Cir.1987). We have said that a rule has such force only if Congress has delegated legislative power to the agency and if the agency intended to exercise that power in promulgating the rule. See, e.g., American Postal Workers Union v. U.S. Postal Service, 707 F.2d 548, 558 (D.C.Cir.1983).
 
 
 19
 On its face, the "intent to exercise" language may seem to lead only to more smog, but in fact there are a substantial number of instances where such "intent" can be found with some confidence. The first and clearest case is where, in the absence of a legislative rule by the agency, the legislative basis for agency enforcement would be inadequate. The example used by the Attorney General's Manual fits exactly--the SEC's proxy authority under § 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n. Section 14(b), for example, forbids certain persons, "to give, or to refrain from giving a proxy" "in contravention of such rules and regulations as the Commission may prescribe". 15 U.S.C. § 78n(b). The statute itself forbids nothing except acts or omissions to be spelled out by the Commission in "rules or regulations". The present case is similar, as to Part 50 itself, in that § 813(h) merely requires an operator to maintain "such records ... as the Secretary ... may reasonably require from time to time". 30 U.S.C. § 813(h). Although the Secretary might conceivably create some "require[ments]" ad hoc, clearly some agency creation of a duty is a necessary predicate to any enforcement against an operator for failure to keep records. Analogous cases may exist in which an agency may offer a government benefit only after it formalizes the prerequisites.
 
 
 20
 Second, an agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations; 44 U.S.C. § 1510 limits publication in that code to rules "having general applicability and legal effect". See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C.Cir.1986) (Scalia, J.).
 
 
 21
 Third, " '[i]f a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.' " National Family Planning & Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 235 (D.C.Cir.1992) (quoting Michael Asimow, Nonlegislative Rulemaking and Regulatory Reform, 1985 Duke L.J. 381, 396). See also State of Alaska v. DOT, 868 F.2d 441, 446-47 (D.C.Cir.1989); Homemakers North Shore, [302 U.S.App.D.C. 42] Inc. v. Bowen, 832 F.2d 408, 412 (7th Cir.1987).
 
 
 22
 There are variations on these themes. For example, in Chamber of Commerce v. OSHA, 636 F.2d 464 (D.C.Cir.1980), the agency had on a prior occasion claimed that a certain statutory term, correctly understood, itself imposed a specific requirement on affected businesses. We found that interpretation substantively invalid, but noted the agency's power to promulgate such a requirement on the basis of more general authority. Leone v. Mobil Oil Corp., 523 F.2d 1153 (D.C.Cir.1975). The agency then issued a purported interpretive rule to fill the gap (without notice and comment), and we struck it down as an invalid exercise of the agency's legislative powers. Chamber of Commerce, 636 F.2d at 469.
 
 
 23
 We reviewed a similar juxtaposition of different agency modes in Fertilizer Institute v. EPA, 935 F.2d 1303, 1308 (D.C.Cir.1991). There a statute created a duty to report any "release" of a "reportable quantity" or "RQ" of certain hazardous materials, specifying the RQs but authorizing the EPA to change them by regulation. See 42 U.S.C. § 9602(b). In the preamble to a legislative rule exercising its authority to amend the RQs, the EPA also expatiated on the meaning of the statutory term "release"--improperly broadening it, as petitioners claimed and as we ultimately found. 935 F.2d at 1309-10. But we rejected a claim that the agency's attempted exposition of the term "release" was not an interpretation and therefore required notice and comment. Id. at 1307-09.
 
 
 24
 In United States v. Picciotto, 875 F.2d 345 (D.C.Cir.1989), the Park Service had issued an indisputably legislative rule containing an "open-ended" provision stating that a "permit may contain additional reasonable conditions". Id. at 346. Then, in a rule issued without notice and comment, it established some such conditions. We struck down the disputed condition, as it was not an interpretation of the prior regulation but an exercise of the legislative authority reserved by the prior legislative rule. Id. at 348.
 
 
 25
 This focus on whether the agency needs to exercise legislative power (to provide a basis for enforcement actions or agency decisions conferring benefits) helps explain some distinctions that may, out of context, appear rather metaphysical. For example, in Fertilizer Institute we drew a distinction between instances where an agency merely "declare[s] its understanding of what a statute requires" (interpretive), and ones where an agency "go[es] beyond the text of a statute" (legislative). Id. at 1308. See also Chamber of Commerce, 636 F.2d at 469 (distinguishing between "constru[ing]" a statutory provision and "supplement[ing]" it). The difficulty with the distinction is that almost every rule may seem to do both. But if the dividing line is the necessity for agency legislative action, then a rule supplying that action will be legislative no matter how grounded in the agency's "understanding of what the statute requires", and an interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty (such as EPA's interpretation of "release" in Fertilizer Institute ), will be interpretive, even if, as in that case itself, it widens that duty even beyond the scope allowed to the agency under Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Fertilizer Institute, 935 F.2d at 1308.
 
 
 26
 Similarly, we have distinguished between cases where a rule is "based on specific statutory provisions" (interpretive), and where one is instead "based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate" (legislative). United Technologies Corp. v. EPA, 821 F.2d 714, 719-20 (D.C.Cir.1987). A statute or legislative rule that actually establishes a duty or a right is likely to be relatively specific (and the agency's refinement will be interpretive), whereas an agency's authority to create rights and duties will typically be relatively broad (and the agency's actual establishment of rights and duties will be legislative). But the legislative or interpretive status of the agency rules turns not in some general sense on the narrowness or breadth of the statutory (or regulatory) term in question, but on the prior existence or non-existence of legal duties and rights.
 
 
 27
 Of course an agency may for reasons of its own choose explicitly to invoke its general [302 U.S.App.D.C. 43] legislating authority--perhaps, for example, out of concern that its proposed action might be invalid as an interpretation of some existing mandate, as was true in Leone, the case that set the legal landscape for Chamber of Commerce. In that event, even if a court believed that the agency had been unduly cautious about the legislative background, it would presumably treat the rule as an attempted exercise of legislative power.
 
 
 28
 In an occasional case we have appeared to stress whether the disputed rule is one with "binding effect"--"binding" in the sense that the rule does not " 'genuinely leave[ ] the agency ... free to exercise discretion.' " State of Alaska v. DOT, 868 F.2d at 445 (quoting Community Nutrition Institute v. Young, 818 F.2d 943, 945-46 (D.C.Cir.1987)). That inquiry arose in a quite different context, that of distinguishing policy statements, rather than interpretive rules, from legislative norms. The classic application is Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 38 (D.C.Cir.1974); see also American Bus Ass'n v. United States, 627 F.2d 525, 529 (D.C.Cir.1980) (following PG & E, again in policy statement context). Indeed, the agency's theory in Community Nutrition was that its pronouncement had been a policy statement. See 818 F.2d at 945-46.
 
 
 29
 But while a good rule of thumb is that a norm is less likely to be a general policy statement when it purports (or, even better, has proven) to restrict agency discretion, see, e.g., McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1320-21 (D.C.Cir.1988), restricting discretion tells one little about whether a rule is interpretive. See Attorney General's Manual, supra, at 30 n. 3 (discussing exercise of discretion only in definition of policy statements). Nor is there much explanatory power in any distinction that looks to the use of mandatory as opposed to permissive language. While an agency's decision to use "will" instead of "may" may be of use when drawing a line between policy statements and legislative rules, see Community Nutrition, 818 F.2d at 946-47, the endeavor miscarries in the interpretive/legislative rule context. Interpretation is a chameleon that takes its color from its context; therefore, an interpretation will use imperative language--or at least have imperative meaning--if the interpreted term is part of a command; it will use permissive language--or at least have a permissive meaning--if the interpreted term is in a permissive provision.
 
 
 30
 A non-legislative rule's capacity to have a binding effect is limited in practice by the fact that agency personnel at every level act under the shadow of judicial review. If they believe that courts may fault them for brushing aside the arguments of persons who contest the rule or statement, they are obviously far more likely to entertain those arguments. And, as failure to provide notice-and-comment rulemaking will usually mean that affected parties have had no prior formal opportunity to present their contentions, judicial review for want of reasoned decisionmaking is likely, in effect, to take place in review of specific agency actions implementing the rule. Similarly, where the agency must defend its view as an application of Chevron "prong two" (i.e., where Congress has not "clearly" decided for or against the agency interpretation), so that only reasonableness is at issue, agency disregard of significant policy arguments will clearly count against it. As Donald Elliott has said, agency attentiveness to parties' arguments must come sooner or later. "As in the television commercial in which the automobile repairman intones ominously 'pay me now, or pay me later,' the agency has a choice...." E. Donald Elliott, Reinventing Rulemaking, 41 Duke L.J. 1490, 1491 (1992). Because the threat of judicial review provides a spur to the agency to pay attention to facts and arguments submitted in derogation of any rule not supported by notice and comment, even as late as the enforcement stage, any agency statement not subjected to notice-and-comment rulemaking will be more vulnerable to attack not only in court but also within the agency itself.
 
 
 31
 Not only does an agency have an incentive to entertain objections to an interpretive rule, but the ability to promulgate such rules, without notice and comment, does not appear more hazardous to affected parties than the likely alternative. Where a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation [302 U.S.App.D.C. 44] evolve ad hoc in the process of enforcement or other applications (e.g., grants). The protection that Congress sought to secure by requiring notice and comment for legislative rules is not advanced by reading the exemption for "interpretive rule" so narrowly as to drive agencies into pure ad hocery--an ad hocery, moreover, that affords less notice, or less convenient notice, to affected parties.
 
 
 32
 Accordingly, insofar as our cases can be reconciled at all, we think it almost exclusively on the basis of whether the purported interpretive rule has "legal effect", which in turn is best ascertained by asking (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule.
 
 
 33
 Here we conclude that the August 1992 PPL is an interpretive rule.[2] The Part 50 regulations themselves require the reporting of diagnoses of the specified diseases, so there is no legislative gap that required the PPL as a predicate to enforcement action. Nor did the agency purport to act legislatively, either by including the letter in the Code of Federal Regulations, or by invoking its general legislative authority under 30 U.S.C. § 811(a). See MSHA Program Information Bulletin No. 88-03 (August 19, 1988) (characterizing PPLs generally as "[i]nterpretation"). The remaining possibility therefore is that the August 1992 PPL is a de facto amendment of prior legislative rules, namely the Part 50 regulations. See National Family Planning & Reproductive Health Ass'n v. Sullivan, 979 F.2d at 235; State of Alaska v. DOT, 868 F.2d at 446-47; Sentara-Hampton General Hospital v. Sullivan, 980 F.2d 749, 759 (D.C.Cir.1992).
 
 
 34
 A rule does not, in this inquiry, become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted. If that were so, no rule could pass as an interpretation of a legislative rule unless it were confined to parroting the rule or replacing the original vagueness with another. See American Postal Workers Union, 707 F.2d at 558-59 (interpretive rule establishes new formula for computation of retirement annuities for certain postal workers); see also Fertilizer Institute, 935 F.2d at 1309-10 (rule found to be interpretive notwithstanding its brightline character); General Motors Corporation, 742 F.2d at 1564 (same).
 
 
 35
 Although petitioners cite some definitions of "diagnosis" suggesting that with pneumoconiosis and silicosis, a diagnosis requires more than a chest x-ray--specifically, additional diagnostic tools as tissue examination or at least an occupational history, see Current Medical Methods in Diagnosing Coal Workers' Pneumoconiosis, and a Review of the Medical and Legal Definitions of Related Impairment and Disability, submission to Congress by United States Department of Labor, Secretary of Labor William E. Brock (1986) at 4, 19 & 46--MSHA points to some administrative rules that make x-rays at the level specified here the basis for a finding of pneumoconiosis. See, e.g., 42 CFR § 37.7(a); 20 CFR § 410.428(a)(1); Garcia v. Director, OWCP, 869 F.2d 1413, 1415-16 (10th Cir.1989) (applying § 410.428(a)(1) and other authority). See also ILO, ILO U/C International Classification of Radiographs of Pneumoconioses 16 (1972) (indicating that ILO score above 1/0 reflects evidence of pneumoconiosis); U.S. Department of Health and Human Services, Occupational Respiratory [302 U.S.App.D.C. 45] Diseases 148-49 (James Merchant et al., eds., 1986) (ILO scores under 1/0 "are usually regarded as normal or as exhibiting essentially no evidence of pneumoconiosis," whereas those 1/0 and above "are generally regarded as positive for pneumoconiosis"). A finding of a disease is surely equivalent, in normal terminology, to a diagnosis, and thus the PPLs certainly offer no interpretation that repudiates or is irreconcilable with an existing legislative rule.
 
 
 36
 We stress that deciding whether an interpretation is an amendment of a legislative rule is different from deciding the substantive validity of that interpretation. An interpretive rule may be sufficiently within the language of a legislative rule to be a genuine interpretation and not an amendment, while at the same time being an incorrect interpretation of the agency's statutory authority. Cf. Fertilizer Institute, 935 F.2d at 1308 (petitioners' argument "confuses the question whether the agency is interpreting a statute with the question whether the agency is thoroughly, or properly, interpreting the statute"). Here, petitioners have made no attack on the PPLs' substantive validity. Nothing that we say upholding the agency's decision to act without notice and comment bars any such substantive claims.
 
 Accordingly, the petitions for review are
 
 37
 Dismissed.
 
 
 
 [1]
 The Part 50 regulations were promulgated after passage of the Mine Act but before its effective date. The regulations were initially issued by the Mining Enforcement and Safety Administration of the Department of Interior, the predecessor to the MSHA, and the Mine Act provided that such regulations would continue in force after the Mine Act became effective. See 30 U.S.C. § 961(c)(2)
 
 
 [2]
 The respondents argue that the challenges as to the first two PPLs are moot, although they concede that whether the challenges are moot will have no bearing on the interpretive/legislative status of the third PPL and little, if any, practical effect otherwise. (During the period the first two PPLs were in effect no citations were issued for an operator's failure to report a "diagnos[is]" by x-ray). The record does not indicate whether the MSHA could bring an enforcement action for an as yet undiscovered non-reporting of an x-ray "diagnos[is]" which took place when the first two PPLs were in effect. Because our ruling as to the third PPL will clearly cover the earlier two, we believe the mootness issue is itself moot