KENNARD, J., Concurring and Dissenting.
I agree with much of the majority opinion. In particular, I agree that although the rule at issue here (Cal. Code Regs., tit. 18, § 474; hereafter Rule 474), which was adopted by defendant Board of Equalization (Board), does not conflict with any statute or with the state Constitution, it nevertheless is invalid because it was not adopted in compliance with California’s Administrative Procedure Act (Gov. Code, § 11340 et seq.; hereafter California APA). But if the Board complies with the California APA and concludes, after compliance, that the rule is warranted, the Board may reissue the same rule.
In deciding that Rule 474 does not conflict with any statute or with the state Constitution, the majority characterizes the rule as a quasi-legislative regulation, subject to the great judicial deference applicable to such regulations. (Maj. opn., ante, at pp. 414-415.) I disagree. I would hold that the rule simply represents the Board’s interpretation of the Legislature’s definition of “real property” in Revenue and Taxation Code section 51, subdivision (d) (section 51(d)), and therefore the rule is an interpretive regulation subject to less judicial deference. Nevertheless, because Rule 474 correctly interprets the statute, I agree with the majority that it is substantively valid.
I
Plaintiff Western States Petroleum Association sued the Board, arguing, as relevant here, that Rule 474—which relates to the taxation of petroleum refinery properties—conflicts with Revenue and Taxation Code section 51. That statute describes the method for calculating “the taxable value of real property.” (Rev. & Tax. Code, § 51, subd. (a).) “ ‘[R]eal property’ ” is “that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately.” (§ 51(d).) Through Rule 474, the Board applies the statutory definition of “real property” to petroleum refinery property, which is involved here.
The Board issued Rule 474 under its express rulemaking authority over the assessment of property for purposes of taxation. (See Gov. Code, § 15606.) The rule reflects the Board’s understanding of how section 51(d) should be *433 applied, as well as the Board’s factual findings concerning the market for petroleum refinery property. Under that rule, the value of petroleum refineries, unlike most types of industrial property, must generally be assessed as a single unit that includes both land and fixtures. Specifically, “[t]he land, improvements, and fixtures and other machinery and equipment classified as improvements for a petroleum refining property are rebuttably presumed to constitute a single appraisal unit . . . .” (Rule 474.) The Board’s rule is significant because of the limits the state Constitution places on the assessed value of land.
For tax purposes, the state Constitution values land at the “base year value” (generally, the market value when last sold), increased by an inflation factor that may not exceed 2 percent per year. (Cal. Const., art. XIII A, § 2.) Rule 474’s bundling of land and fixtures affects property owners because land values tend to appreciate over time but fixture values tend to depreciate. For petroleum refinery property, fixtures represent a major portion of the property’s overall value. If fixtures are taxed together with land as a single unit, then depreciation in the value of the fixtures is generally offset by appreciation in the value of the land, and thus for tax purposes the overall value of the property remains unchanged. If, however, fixtures are taxed separately from land, then the owner will pay lower taxes on the fixtures as their values depreciate over time, and those lower fixture taxes will not be offset by higher land taxes because of the just-described limits imposed by the state Constitution.
Plaintiff challenges the Board’s Rule 474 because assessment of a petroleum refinery’s land and fixtures as a single unit increases the overall taxes for the owners of such properties.
The majority concludes, as do I, that Rule 474 does not conflict with section 51(d). But in reaching that conclusion, the majority states that Rule 474 is a quasi-legislative regulation, and therefore entitled to great deference on judicial review. (Maj. opn., ante, at pp. 414-415.) By contrast, I construe the Board’s rule as an interpretive regulation, subject to a lesser degree of judicial deference.
II
An administrative agency’s regulations can be of two types: interpretive and quasi-legislative. As explained below, an interpretive regulation defines or clarifies an ambiguous term or phrase in a statute, whereas a quasi-legislative regulation is issued under a delegation of legislative power to fill a substantive gap left open in a statute. The measure of whether a regulation is quasi-legislative is whether it makes a new legal standard where none *434 previously existed. The regulation is interpretive if applicable statutory law creates an enforceable standard irrespective of the regulation.
The differences between the two types of regulations were described in detail by this court 13 years ago: “It is a ‘black letter’ proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature’s lawmaking power. . . • [f] . . . [f] . . . .Unlike quasi-legislative rules, an agency’s interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency’s view of the statute’s legal meaning and effect, questions lying within the constitutional domain of the courts.” (Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 10-11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (Yamaha), italics added, citations omitted; see American Mining Congress v. Mine Safety & Health Administration (D.C. Cir. 1993) 302 U.S. App.D.C. 38 [995 F.2d 1106, 1110] (American Mining) [“[T]he dividing line [between interpretive and quasi-legislative regulations] is the necessity for agency legislative action .... [A] rule supplying that action will be legislative . . . , and an interpretation that spells out the scope of an agency’s or regulated entity’s pre-existing duty . . . will be interpretive . . . .”].)[1]
Yamaha also explained that quasi-legislative regulations are entitled to a high degree of deference, and that interpretive regulations are not. “Because agencies granted . . . substantive rulemaking power are truly ‘making law,’ their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end. [][]... [][] . . . Because an interpretation is an agency’s legal opinion, . . . rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference. [Citation.]” (Yamaha, supra, 19 Cal.4th at pp. 10-11, first & third italics added.)
*435 Yamaha went on to say: “[E]ven formal interpretive rules do not command the same weight as quasi-legislative rules. Because ' “the ultimate resolution of . . . legal questions rests with the courts” ’ [citation], judges play a greater role when reviewing the persuasive value of interpretive rules than they do in determining the validity of quasi-legislative rules.” (Yamaha, supra, 19 Cal.4th at p. 13, italics added.)
This court later reiterated the same point in Sara M. v. Superior Court (2005) 36 Cal.4th 998 [32 Cal.Rptr.3d 89, 116 P.3d 550]: “Quasi-legislative rules are those that the agency promulgates as part of the lawmaking power the Legislature has delegated to it. Judicial review of these rules is very limited. [Citation.] Rules that interpret a statute receive less judicial deference.” (Id. at p. 1012, first & third italics added.)
In summary, an agency’s quasi-legislative regulations involve the discretionary creation of new law under a delegation of legislative power; court review is therefore limited to ensuring that the regulation is within the scope of the delegated power and not arbitrary, capricious, or lacking in a rational basis. (Yamaha, supra, 19 Cal.4th at p. 11.) By contrast, interpretive regulations explain what existing law means, which is ultimately a task for the courts to perform. Although courts give “great weight” to the administrative agency’s view of the matter, they do not otherwise defer to the agency. (Id. at p. 12.)
in
As noted (see ante, at p. 432), section 51(d), the statute involved here, defines “real property” for purposes of taxation as “that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately.” The Board’s Rule 474, adopted after the statute’s enactment, states that the value of petroleum refinery property must generally be assessed as a single unit that includes both land and fixtures. The majority here asserts that Rule 474 is quasi-legislative because “[t]he precise content of [the] regulation[] is neither mandated nor prohibited . . .” by section 51(d). (Maj. opn., ante, at p. 414.) I disagree. In my view, Rule 474 interprets section 51(d), by applying it to a specific type of property.
Here, it is section 51(d), not Rule 474, that provides the governing substantive standard. With or without Board rules elucidating the application of section 51(d) to specific types of property, section 51(d) adequately defines “real property” and can be applied to various types of real property, including petroleum refinery properties, on a case-by-case basis. In other words, even without a rule on point, the Legislature’s statutory definition of “real property” is, by itself, a fully enforceable legal standard.
*436 This case is not one in which a statute identifies a complex problem (such as air pollution), sets forth a general goal (such" as meeting state and federal air quality standards), and then broadly empowers an agency to study the problem and to adopt appropriate guidelines for specific industries that will achieve the Legislature’s general goal. (See, e.g., Health & Saf. Code, § 40001, subd. (a); see American Coatings Assn. v. South Coast Air Quality Management Dist. (2012) 54 Cal.4th 446, 452-458 [142 Cal.Rptr.3d 581, 278 P.3d 838].) In such a case, the statutory requirement is not self-executing, and the agency’s regulation is necessary to establish which specific actions are prohibited and which are permitted. Not of that type, however, is section 51(d)’s definition of “real property” for purposes of taxation. Section 51(d) has no language through which the Legislature empowered the Board to make new law defining real property. Rather, section 51(d)’s definition of real property is fully self-executing and enforceable irrespective of the Board’s rules interpreting how it should be applied in specific situations.
The majority bases its conclusion that Rule 474 is quasi-legislative on the express grant of rulemaking authority set forth in Government Code section 15606. (Maj. opn., ante, at pp. 414-415.) When the Legislature uses open-ended statutory language and expressly delegates to an administrative agency the power to interpret key words in the statute at issue, the agency’s interpretation of those words is both quasi-legislative and interpretive. (Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th 785, 800 [85 Cal.Rptr.2d 844, 978 P.2d 2] (Ramirez); see Yamaha, supra, 19 Cal.4th at pp. 17-18 (conc. opn. of Mosk, J.).) It is quasi-legislative because the agency acts under an express delegation of lawmaking power; it is interpretive because the agency is giving meaning to an open-ended term in the statute. (Ramirez, at p. 800.) This court has not resolved what standard of review applies to such hybrid cases.
But for a regulation to be both quasi-legislative and interpretive, there must be some clear indication that the Legislature actually intended and authorized the agency to exercise legislative power in interpreting statutory terms. (See Ramirez, supra, 20 Cal.4th at pp. 799-800.) A mere generic grant of rulemaking authority, which can be found for nearly every California agency (see, e.g., Ed. Code, § 33031 [State Bd. of Education]; Pub. Resources Code, § 5003 [Dept. of Parks and Recreation]; Veh. Code, § 1651 [Dept. of Motor Vehicles]), is not enough to establish that the agency acts legislatively whenever it issues an interpretive regulation. Otherwise, virtually every interpretive regulation would be quasi-legislative, and the category of interpretive regulations would cease to have any practical meaning. That would be at odds with what this court said in Yamaha, supra, 19 Cal.4th at pages 10-11, and because of the deference owed to quasi-legislative regulations, it would undermine the constitutional role of the courts in interpreting statutory law.
*437 Hence, in those cases where this court has concluded that the regulation in question has both quasi-legislative and interpretive characteristics, a clear indication existed that the Legislature intended the agency to exercise legislative power when interpreting the statute that the agency is charged with enforcing. (See Ramirez, supra, 20 Cal.4th at pp. 799-800; Moore v. California State Bd. of Accountancy (1992) 2 Cal.4th 999, 1013-1014 [9 Cal.Rptr.2d 358, 831 P.2d 798].) That clear indication is lacking here. In such a situation, courts give the agency’s interpretation of statutory language “great weight” but do not otherwise defer. (Yamaha, supra, 19 Cal.4th at p. 12.) Of course, to the extent an administrative regulation embodies findings of fact, courts must give such findings appropriate deference. (Ibid.; see Carmona v. Division of Industrial Safety (1975) 13 Cal.3d 303, 314 [118 Cal.Rptr. 473, 530 P.2d 161] (Carmona).)
This case is similar to Carmona, supra, 13 Cal.3d 303, a decision of this court. Carmona involved a regulation issued by the California Division of Industrial Welfare prohibiting the use of “ ‘[u]nsafe hand tools.’ ” (Id. at p. 307, italics omitted.) A group of farmworkers asked the agency to issue what was in effect a supplemental rule declaring the “short-handled hoe” to be an unsafe hand tool and banning its use throughout California. (Ibid.) Instead, the agency issued a decision that the short-handled hoe was not an unsafe tool within the meaning of the regulation at issue, reasoning that the short-handled hoe was not inherently unsafe. (Id. at p. 308.)
That Carmona involved the interpretation of a regulation, not a statute, is not significant. “The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and ... the ultimate resolution of such legal questions rests with the courts.” (Carmona, supra, 13 Cal.3d at p. 310.) What is significant is that Carmona, like this case, involved the application of a broad term (“unsafe hand tools”) to a specific category (the '“short-handled hoe”). Carmona concluded that the agency’s decision (which permitted the statewide use of short-handled hoes and thus was, in effect, a regulation) was interpretive, not quasi-legislative. (Ibid.) As such, this court gave “great weight” to the agency’s interpretation, but the court did not otherwise defer to the agency. (Ibid.) Instead, the court concluded that the agency had misconstrued the unsafe-hand-tool regulation, and that the proper interpretation of that regulation should consider whether a particular tool was unsafe as used, not merely whether it was inherently unsafe. (Id. at pp. 311-313.) Carmona remanded the matter to the agency for a new factual determination based on a correct understanding of the law. (Id. at p. 314.)
Like the California Division of Industrial Welfare’s application in Carmona of the unsafe-hand-tool regulation (Carmona, supra, 13 Cal.3d at p. 307) to a specific category of hand tool, the Board’s application here of the statutory *438 definition of “real property” (§ 51(d)) to a specific category of property is an interpretation of the statute. As such, it is entitled to “great weight,” but not to any greater judicial deference. (Yamaha, supra, 19 Cal.4th at p. 12.)
The question remains whether the Board’s construction of section 51(d) in Rule 474 was correct. In my view it was. As noted, section 51(d) defines “real property” as “that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately.” The Board took evidence and determined, as a factual matter, that the land and fixtures of petroleum refinery property are virtually always bought and sold in California as a single unit. Giving “great weight” (Yamaha, supra, 19 Cal.4th at p. 12) to the Board’s interpretation of section 51(d), I agree with the Board that the relevant “marketplace” for purposes of applying section 51(d) is the California marketplace. In this context, the California marketplace makes the most sense, as section 51(d) governs the taxation of California property. I also agree with the Board that the word “commonly” in section 51(d) does not require a high volume of sales, but rather an examination of which type of sale is most typical among the few sales that occur.
From the Board’s interpretations and factual findings, it follows that both the land and fixtures of petroleum refinery property constitute “real property” under section 51(d), and that is what the Board’s Rule 474 says. The rule states that “[t]he land . . . and fixtures ... for a petroleum refining property are rebuttably presumed to constitute a single appraisal unit . . .” (and therefore “real property” under section 51(d)). (Rule 474.) Because Rule 474 correctly interprets section 51(d), it is substantively valid.
Nevertheless, I agree with the majority that because the Board did not comply with the California APA in adopting Rule 474, the rule is procedurally invalid, and therefore the Court of Appeal’s judgment invalidating Rule 474 is correct.

 Although American Mining, supra, 995 F.2d 1106, construes the federal Administrative Procedure Act (5 U.S.C. § 551 et seq.), not the California APA, its discussion of the distinction between interpretive and quasi-legislative regulations has received wide recognition in the field of administrative law. (See, e.g., Breyer et al., Administrative Law and Regulatory Policy (4th ed. 1999) pp. 622-623; Davis & Pierce, Administrative Law Treatise (Supp. 2000) pp. 189-190; Mashaw et al., Administrative Law, The American Public Law System (5th ed. 2003) pp. 587-592.)